**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TOREY T. CANFIELD, | Case No. |
| Plaintiff, | RECEIVED: JULY 28, 2008<br>08CV4264<br>JUDGE CONLON<br>MAGISTRATE JUDGE MASON<br>YM |
| v. | |
| MATHEW SETORK, CROSSLANDER<br>OF MONTGMERY, INC., and<br>MAHMOOD GHASSEMI, | |
| Defendants. | **Jury Trial Demanded** |

## COMPLAINT

Plaintiff TOREY T. CANFIELD, by and through his attorney, brings this action against Defendants MATHEW SETORK, CROSS LANDER OF MONTGOMERY, INC., and MAHMOOD GHASSEMI (collectively "Defendants"), and alleges the following:

### NATURE OF ACTION

1.     Throughout Torey Canfield's employment with Cross Lander of Montgomery, Inc., he was forced to endure racially disparaging comments against African-Americans from Mathew Setork (Caucasian) – the owner of Cross Lander of Montgomery, Inc.  Mr. Setork's conduct rose to the level of a racially hostile work environment during the final months of Mr. Canfield's employment.  Ultimately, Mr. Setork refused to pay Mr. Canfield wages he was owed and unlawfully terminated his employment based on his race and/or because he opposed unlawful conduct.  Worse for Mr. Canfield, after his termination Mr. Setork – with the help of his business partner,

1

Mahmood Ghassemi – retaliated against Mr. Canfield by, among other things, taking steps to have him evicted from his home.

2.      This lawsuit arises under the Civil Rights Act of 1866, as amended, 42 U.S.C. §§ 1981, 1985, and 1986, ("CRA of 1866"). This lawsuit also arises under the Illinois Wage Payment and Collection Act, 820 ILCS § 115/1 *et seq.* ("IWPCA"), for Defendants' failure to pay earned wages to Mr. Canfield. This lawsuit also arises under the Illinois Minimum Wage Law, 820 ILCS §105/1 *et seq.* ("IMWL") and the public policy of the IMWL and IWPCA that prohibits retaliation against individuals who assert their rights to collect wages owed under law. This lawsuit also arises under Illinois common law relating to breach of contract, fraudulent inducement, and fraud.

3.      Mr. Canfield also intends to assert claims against Defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq.* ("Title VII") and the Illinois Human Rights Act, 775 ILCS § 5/1 *et seq.* ("IHRA"). Mr. Canfield is in the process of exhausting his administrative remedies by filing charges with the Illinois Department of Human Rights and/or the Equal Employment Opportunity Commission. Additionally, Mr. Canfield is investigating his ability to file representative discriminatory lending claims on behalf of himself and other customers of Defendant Cross Lander. Mr. Canfield may seek leave to amend his Complaint to include any such claims at an appropriate time.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Mr. Canfield's federal law claims, including his claims under the CRA of 1866, pursuant to 28 U.S.C. § 1331.

5. This Court also has supplemental jurisdiction over Mr. Canfield's state law claims pursuant to 28 U.S.C. § 1367(a).

6. Venue is proper in this judicial district as the facts and events giving rise to Mr. Canfield's claims occurred in this judicial district.

## PARTIES

7. Mr. Canfield, an African-American, resides in and is domiciled in this judicial district.

8. Mr. Setork, a Caucasian, resides in and is domiciled in this judicial district.

9. Mr. Ghassemi, a non-African-American, resides in and is domiciled in this judicial district.

10. Cross Lander of Montgomery, Inc. ("Cross Lander") is an Illinois business engaged in the sale and service of automobiles and motorcycles. Cross Lander's principal place of business is located at 111 South Lake Street, Montgomery, Illinois 60538, within this judicial district.

11. Mr. Setork is the owner, President and Secretary of Cross Lander and is involved in the day-to-day business operations of Cross Lander. Among other things, Mr. Setork has the authority to hire and fire employees, to direct and supervise the work of the employees, to sign on the checking accounts, including payroll accounts, and to participate in decisions regarding employee compensation and capital expenditures.

12.    From approximately May 2006 to Saturday, May 24, 2008, Mr. Canfield was an "employee" of Defendants Cross Lander and Mr. Setork as that term is defined by the IMWL and the IWPCA.

13.    From approximately May 2006 to May 24, 2008, Defendants Cross Lander and Mr. Setork were Mr. Canfield's "employers" subject to the IMWL, 820 ILCS 105/3(c).

14.    During the course of his employment with Defendants Cross Lander and Mr. Setork, Mr. Canfield handled goods that moved in interstate commerce and had a wage agreement with Defendants Cross Lander and Mr. Setork.

## FACTS

**Mr. Canfield's Employment And Wage Agreement**

15.    Defendants Cross Lander and Mr. Setork employed Mr. Canfield from approximately May 2006 through May 24, 2008.  From approximately May 2006 until approximately September 2006, Mr. Canfield worked as a sales person.

16.    Beginning in approximately September 2006, Mr. Canfield began working as the Finance Manager.  As the Finance Manager, Mr. Canfield's primary responsibilities included arranging for financing for customers' purchases and selling certain products and services to customers.

17.    When Mr. Canfield first became Finance Manager, he was paid approximately $500/week in salary plus commissions.  Mr. Canfield earned commissions for arranging for financing terms for the sale of automobiles and

motorcycles, as well as for selling certain products or services to customers (e.g., back-end products like warranties, tire and wheel packages, "GTTP" and "Gap-Ins").

18.    In approximately September 2007, Ms. Canfield and Mr. Setork reached a wage agreement pursuant to which his salary increased, but his commission opportunities decreased.

19.    Specifically, in approximately September 2007, Mr. Canfield and Mr. Setork agreed Mr. Canfield would be paid a salary the equivalent of $52,000 per year ($1,000/week) plus commissions ($175 for each automobile and $75 for each motorcycle that I sold, $150 for each motorcycle or automobile that I helped finance, $50 per "back-end" item for motorcycles, and $75 per "back-end" item for automobiles).

20.    From approximately September 2007 until the pay period ending prior to May 24, 2008, Mr. Canfield's compensation reflected payment of both his salary and commissions earned pursuant to this agreement.  His paychecks (received every other week) would reflect a payment of his salary ($2,000 per pay period for 26 pay periods). At the end of each month, Mr. Canfield would receive a handwritten check or cash from Mr. Setork for payments of commissions.

21.    Throughout his employment, Mr. Canfield satisfactorily performed his job duties.  Indeed, in Spring 2007 and Summer 2007, Mr. Canfield effectively managed Cross Lander's operations during Mr. Setork's vacations.

**Mr. Canfield's Other Arrangements With Defendants**

22.    During his employment with Defendants Cross Lander and Mr. Setork, Mr. Canfield entered into several contracts with Defendants.

23.     For example, in approximately Summer 2006, Mr. Canfield arranged for the purchase of an automobile (an Oldsmobile Intrigue) from Defendant Cross Lander. Mr. Canfield paid Defendant Cross Lander everything it was owed under this arrangement until he traded the automobile in for a different vehicle.

24.     Additionally, in approximately Fall 2006, Mr. Canfield arranged for the purchase of an automobile (an Audi A-4) from Defendant Cross Lander. Mr. Canfield paid Defendant Cross Lander everything it was owed under this arrangement until he traded the automobile in for a different automobile.

25.     Additionally, in approximately April 2007, Mr. Canfield arranged for the purchase of an automobile (an Infiniti G-35) from Defendant Cross Lander. Mr. Canfield paid Defendant Cross Lander everything it was owed under this arrangement.

26.     Similarly, on approximately May 8, 2008, Mr. Canfield arranged for the purchase of a motorcycle from Defendant Cross Lander. Mr. Canfield paid Defendant Cross Lander everything it was owed under this arrangement.

27.     Further, on approximately October 31, 2007, Mr. Canfield signed a document entitled "Installment Real Estate Sale Contract" ("rent-to-own lease"). A copy of this document – purportedly an agreement by Defendants Mr. Setork and Mr. Ghassemi to lease and eventually sell Mr. Canfield a home in Aurora ("the premises") – is attached as Exhibit A. Defendants breached the rent-to-own lease and/or fraudulently induced Mr. Canfield to enter into the agreement, making the agreement void or voidable.

**Harassment Of Mr. Canfield**

28.     Throughout his employment with Defendants Cross Lander and Mr. Setork, Mr. Canfield repeatedly heard Mr. Setork make comments demonstrating that Mr. Setork held negative stereotypes or biases about African-Americans.

29.     For example, Mr. Setork repeatedly stated made comments that black women were not as good as Persian women or Mexican women.

30.     Mr. Setork also repeatedly made remarks or comments like and including the following:  "blacks never pay on time – they always come up with excuses. Mexicans always pay on time, no matter what."

31.     Mr. Setork also repeatedly made comments like and including the following:  "black people have bad attitudes" or "I trust a Mexican more than a black person to pay me money"and "black people will make excuses about not paying."

32.     Mr. Setork made comments like these or other negative comments about African-Americans approximately every other day throughout Mr. Canfield's employment.

33.     On several occasions, Mr. Canfield told Mr. Setork he should not make comments like this because they were offensive, but Mr. Setork would try to play the comments off as "jokes."  Mr. Canfield found the comments offensive despite the fact that Mr. Setork considered them "jokes."

34.     From approximately March 2008 through Mr. Canfield's termination of employment, Mr. Setork's conduct grew worse.  Throughout this period, Defendant Mr. Setork repeatedly made condescending and derogatory comments to or about

Mr. Canfield based on his race and/or color.  Additionally, Mr. Setork subjected Mr. Canfield to heightened scrutiny, rudeness, and inappropriate behavior to which other employees were not subjected.

35.    For example, despite the fact that Mr. Canfield had been allowed to enter the safe as part of his job duties, beginning in approximately March or Apirl 2008, Mr. Setork began to restrict Mr. Canfield's access to the safe.  Additionally, Mr. Setork began to act paranoid towards Mr. Canfield and began to watch him and question him more frequently.

36.    Additionally, when Mr. Canfield missed work in mid-April 2008 due to an illness, Mr. Setork criticized him in a way he did not treat other employees.

37.    Specifically, on approximately April 21, 2008, Mr. Canfield met with Mr. Setork to discuss Mr. Canfield's absence due to illness.  During their meeting Mr. Setork started to yell at Mr. Canfield, stating "what do you want?  Why are you here?" When Mr. Canfield tried to explain, Mr. Setork yelled "I pay you and you work for me – I don't have to talk to you."  Mr. Setork did not treat non-African-Americans this way.

38.    Mr. Setork did not believe Mr. Canfield was ill and implied Mr. Canfield was making an excuse for missing work, telling Mr. Canfield "I don't care if your mother is dying, you have to be at work."  Mr. Setork also told Mr. Canfield, "you black people – that's just your nature" and continued yelling at Mr. Canfield.

39.    Mr. Canfield felt so bad, he did not know how to respond.  Exasperated, he simply asked Mr. Setork what he should do.  Mr. Setork responded by saying "I

don't want you to work for me anymore." Mr. Canfield reluctantly agreed, and began gathering his things.

40.     As Mr. Canfield was gathering his things, Mr. Setork continued yelling at him. Mr. Setork also continued making racially motivated remarks about Mr. Canfield, stating "black people – that just what you do" and making similar comments.

41.     Mr. Canfield understood Mr. Setork was referring negative stereotypes that African-Americans were dishonest, lazy or not hard workers. Mr. Canfield also understood his employment had been terminated.

42.     Mr. Canfield could not afford not to work, but also was growing weary of Mr. Setork's harassment and abuse. After several days, Mr. Canfield contacted Mr. Setork about picking up his paycheck and his job.

43.     On approximately April 28, 2008, Mr. Canfield and Mr. Setork spoke about Mr. Canfield's paycheck. During their conversation, Mr. Canfield and Mr. Setork also discussed Mr. Canfield continuing his employment as finance officer.

44.     Mr. Canfield agreed to continue working for Defendants Cross Lander and Mr. Setork, but explained that Mr. Setork could not continue using abusive, racially-charged language and abuse.

45.     Mr. Canfield only considered continuing to work for Defendants Cross Lander and Mr. Setork because he needed income and believed Mr. Setork would stop harassing him.

46.     Mr. Canfield continued working as a finance officer pursuant to the same wage agreement under which he had previously worked. During the first pay period

for the month of May, Mr. Canfield was paid his salary of $1000/week. At no point did Mr. Setork ever inform Mr. Canfield his wage rate would be reduced or changed in any way.

47.    Ms. Canfield's employment continued after his April 28, 2008 conversation with Mr. Setork, but so did Mr. Setork's racially motivated harassment. Within approximately one to two weeks of Mr. Canfield's and Mr. Setork's April 28, 2008 conversation, Mr. Canfield again overheard Mr. Setork making racially biased and/or stereotypes comments about African-Americans – including Mr. Canfield and his coworker.

48.    Specifically, in early or mid-May 2008, Mr. Canfield overheard Mr. Setork's conversation with Edward Bingham (the motorcycle garage manager). Mr. Setork was talking about Mr. Canfield and Kerry Stewart, another African-American employee, and African-Americans generally. Mr. Setork described Mr. Canfield and Mr. Steward, along with African-Americans generally, as lazy, not wanting to work, and unorganized. Mr. Setork even made comments about how they, as African-Americans, thought.

49.    Mr. Setork continued to create a hostile work environment for Mr. Canfield until and including approximately Saturday, May 24, 2008, when Defendants Cross Lander and Mr. Setork terminated Mr. Canfield's employment.

**Mr. Canfield's Termination Of Employment**

50.     On Saturday, May 24, 2008, Mr. Setork presented Mr. Canfield with a paycheck that paid Mr. Canfield at a salary rate different from his $1000/week salary.

51.     Mr. Canfield hoped to be paid the wages he had earned and, accordingly, repeatedly asked Mr. Setork to pay him the wages he was owed.  Mr. Setork repeatedly refused, often walking away from Mr. Canfield.

52.     During their conversations, Mr. Setork explained to Mr. Canfield that Mr. Canfield's wages were reduced to account for debts Mr. Setork claimed he was owed.

53.     Mr. Canfield explained he would pay Mr. Setork anything he owed under their arrangements, as he had previously.  Despite Mr. Canfield's assurances and history of paying what was owed, Mr. Setork refused to pay Mr. Canfield what Mr. Canfield earned.

54.     After Mr. Canfield's repeated requests to be paid what he had earned, Mr. Setork exited the building and got into his truck to leave the Cross Lander dealership. At that point, as Mr. Setork was leaving, Mr. Canfield shouted a request that Mr. Setork please pay him the money he was owed because it was the holiday weekend, but Mr. Setork said no while appearing to drive away.

55.     Mr. Canfield entered the dealership building to return to his office.  Mr. Setork quickly followed Mr. Canfield and asked Mr. Canfield, "what the hell are you doing here?"  Mr. Canfield explained he was waiting for Mr. Setork to pay him.

56.    Mr. Setork looked at Mr. Canfield condescendingly and stated, "you stupid motherfucker – get out – I'm not going to pay you shit."  Mr. Canfield explained that he merely wanted to be paid what he had earned so he could go home.

57.    Mr. Canfield waited to be paid the wages he was owed.  During discussions with Mr. Canfield in Mr. Setork's office, Mr. Setork referred to Mr. Canfield's race directly on at least three occasions:

- Mr. Setork stated, "I should have listened to what someone told me about that black guy" (referring to Mr. Canfield);

- Mr. Setork stated, "this is what black guys like you do"; and

- Mr. Setork asked Mr. Canfield if he was going to "bring a bunch of your black friends in here" to threaten him.

58.    As another example of acting on negative stereotypes about African-Americans, Mr. Setork threatened to call the police and falsely accuse Mr. Canfield of theft.  Specifically, Mr. Setork stated "I am not going to pay you shit, I am going to call the police and tell them you are trying to rob me you motherfucker."

59.    Mr. Setork called "911," but hung up.  The police called back and Amin (last name unknown) answered.  Amin (last name unknown) is the son of Mr. Setork's long-time friend and employee, "Mo" (believed to be short for "Mohammed," which may be his first or last name).  "Mo" is employed as the automobile shop manager. Amin (last name unknowns) is employed as a "buyer" and travels to auctions to purchase cars.

60.     When Amin (last name unknown) answered, he informed the police Mr. Canfield and Mr. Setork were fighting. ,.  Mr. Canfield tried to explain that they were not fighting, there were merely arguing, loudly enough so the police could hear it. As Mr. Canfied did this, Mr. Setork shouted several times "he's trying to rob me."

61.     Mr. Setork and Mr. Canfield did not come into physical contact with each other at any point during any of their discussions on May 24, 2008.  Mr. Setork never touched Mr. Canfield and Mr. Canfield never touched Mr. Setork.

62.     When the Montgomery police arrived and realized what was really happening, they took no action against Mr. Canfield.  Mr. Setork, however, demanded that Mr. Canfield be removed from the premises and barred from returning.  This action effectively terminated Mr. Canfield's employment.

63.     Ultimately, Mr. Canfield was escorted from the premises peacefully by a Montgomery police officer after having an opportunity to gather some of his personal materials.

**Additional Evidence Of Bias And Stereotypes Against African-Americans**

64.     Mr. Setork's stereotypes and biases against African-Americans are evidenced in the composition of Defendants' workforce.  Although Defendants employed approximately 25 employees at any given time during Mr. Canfield's employment, only approximately three of those employees (including Mr. Canfield) were African-American.

65.     Additionally, Mr. Setork gave non-African-Americans preferential lending terms in connection with cars or motorcycles financed through Cross Lander.  For

example, Mr. Setork frequently offered Caucasians and Hispanics short-term financing without interest or at lower interest rates than African-Americans.  By contrast, African-Americans were typically offered the highest financing rates.

66.    Mr. Setork preferred dealing with Hispanic customers over dealing with African-American customers so much that he would frequently arrange for Hispanic customers to obtain fake driver's licenses so they could purchase automobiles or motorcycles at his dealership (a driver's license number is requested by banks in connection with financing an automobile or motorcycle).  Mr. Setork rarely if ever made similar arrangements for African-Americans without licenses.

67.    Mr. Canfield opposed these practices during his employment with Defendants Cross Lander and Mr. Setork, and took what steps he could to ensure African-Americans were not offered discriminatory financing terms.

**Wages Mr. Canfield Earned But Was Not Paid**

68.    For the pay period ending on Saturday, May 24, 2008, Defendants Cross Lander and Mr. Setork failed to pay Mr. Canfield waged he earned.

69.    Based on the information available to Mr. Canfield, he estimates he earned at least $7,325 in salary and commissions during May 2008.

70.    Defendants Cross Lander and Mr. Setork paid Mr. Canfield $2,000 in salary during the first pay period for May 2008, consistent with Mr. Canfield's wage agreement.

71.    But Defendants Cross Lander and Mr. Setork initially refused to pay Mr. Canfield any wages after his termination.

72.     Only after Defendants Cross Lander and Mr. Setork were contacted by Mr. Canfield's attorney did they make arrangements for payment of an additional $1,025 for the pay period ending May 24, 2008.  This payment was more than Defendants Cross Lander and Mr. Setork offered to pay Mr. Canfield on the day of his termination.

73.     To date, Defendants Cross Lander and Mr. Setork have not paid Mr. Canfield all wages that he earned.  Based on the information available to Mr. Canfield, he estimates he is still owed over $4,000 in wages he earned during his employment with Defendant.

74.     Defendants Cross Lander and Mr. Setork acted in bad faith in failing to compensate Mr. Canfield for the work he performed.  Defendants Cross Lander and Mr. Setork were aware of their obligations to pay workers promised wages, but intentionally chose not to pay Mr. Canfield wages that Mr. Canfield earned.

**Post-Employment Retaliation**

75.     After Mr. Canfield's termination of employment, Mr. Canfield (through his attorney) placed Defendants on notice of his intent to pursue claims of unlawful discrimination and unpaid wages via letters dated June 10, 2008 and June 24, 2008.

76.     Defendants Cross Lander and Mr. Setork received the letters from Mr. Canfield's June 10, 2008 letter (from his counsel) on June 12, 2008 and June 17, 2008 respectively.

77.     Defendants Cross Lander and Mr. Setork received Mr. Canfield's June 24, 2008 letter (from Mr. Canfield's counsel) on June 24, 2008 (through their counsel, James Jensen).

78.     Within days of receiving the aforementioned letters, Defendants engaged in a concerted campaign of retaliation relating to Mr. Canfield's home and credit rating. Defendants campaign of retaliation included the following:

- On June 23, 2008, Defendant Mr. Setork attempted to increase Mr. Canfield's financial obligations by refusing to pay Mr. Canfield's water bill and attempting to have the water bill transferred into Mr. Canfield's name. Prior to that time, by agreement with Mr. Canfield and their customary practice, Mr. Setork had paid the water bill for the premises.

- On June 25, 2008, Defendants Mr. Setork and Mr. Ghassemi (through their counsel, Jay R. Wyeth) served Mr. Canfield with a "Notice of Intention to Declare Forfeiture of All Rights Under Installment Real Estate Contract And Notice of Intention to File Forcible Detainer Suit" ("the Notice of Detainer"). Although Mr. Canfield had made previous payments, the Notice of Detainer claimed Mr. Canfield had failed to make any payments owed under the rent-to-own lease.

- At some point approximately on or after July 1, 2008, using supplies, resources and/or property owned by Defendant Cross Lander, Defendants Mr. Setork and/or Mr. Ghassemi, falsely informed a credit reporting agency or agencies that Mr. Canfield had become more than 120

days behind on his rental payments.  Prior to July 1, 2008, however,

Defendants had not reported that Mr. Canfield was 30, 60 or 90 days past

due.

79.     Defendants' primary motivation in taking the actions described in

paragraph 78 was to retaliate against Mr. Canfield for opposing Defendants Cross

Lander's and Mr. Setork's unlawful conduct.  Defendants, acting in concert, wanted to

make Mr. Canfield's life more difficult by increasing his financial burdens and/or

preventing him from being able to maintain stable housing and/or funds necessary for

him to maintain basic life necessities.

80.     Via letter dated July 3, 2008, Mr. Canfield (through his counsel) placed

Defendants on notice (through their counsel) that Mr. Canfield contended Defendants'

actions with respect to the Notice of Detainer and the water bill were retaliatory and

unlawful.

81.     Because Defendants Cross Lander and Mr. Setork refused to pay Mr.

Canfield wages he was owed and unlawfully terminated his employment, Mr. Canfield

does not possess enough money to pay any amounts Defendants Mr. Setork and Mr.

Ghassemi claim they are owed under the rent-to-own lease.

82.     Had Defendants Cross Lander and Mr. Setork paid Mr. Canfield wages he

was owed and/or not unlawfully terminated his employment, Mr. Canfield would have

possessed enough money to pay any amounts actually due to Defendants Mr. Setork

and Mr. Ghassemi under the rent-to-own lease.

**The Rent-to-Own Lease Without A Certificate Of Occupancy**

83.     Mr. Canfield signed the rent-to-own lease with the intent of becoming the owner of the premises.  Additionally, Mr. Canfield made improvements to the premises based on his belief that he would eventually become the owner of the premises.

84.     Contrary to the affidavit of Defendants Mr. Setork's and Mr. Ghassemi's attorney (Jay R. Wyeth), Mr. Canfield made payments he was obligated to make under the rent-to-own lease.

85.     Specifically, Defendant Mr. Setork acknowledged receipt of payments for certain months.  A copy of a partial payment log with Defendant Mr. Setork's initials is attached as Exhibit B.  Mr. Canfield also made payments he was obligated to make for other months not reflected on the partial payment log.

86.     Mr. Canfield provided Defendants evidence of payments he had made that demonstrated inaccuracies in the Notice of Detainer.  In response, Defendant failed to take any action, such as adjusting the amount Defendants claimed it was owed.

87.     Unbeknownst to Mr. Canfield when he signed the rent-to-own lease, the City of Aurora Buildings and Permit Department had not issued a Certificate of Occupancy for the premises.

88.     When Defendant Mr. Setork offered the rent-to-own lease to Mr. Canfield, Mr. Setork was aware no Certificate of Occupancy had been issued for the premises and that no individuals were permitted to occupy the premises.

89.     When Defendant Mr. Ghassemi offered the rent-to-own lease to Mr. Canfield, Mr. Ghassemi was aware no Certificate of Occupancy had been issued for the premises and that no individuals were permitted to occupy the premises.

90.     Mr. Canfield learned that Defendants Mr. Setork and Mr. Ghassemi attempted to convey and/or lease the property to Mr. Canfield without obtaining a Certificate of Occupancy on approximately July 7 or 8, 2008.  Prior to this time, Mr. Canfield was not aware no Certificate of Occupancy had been issued.

91.     According to the report Mr. Canfield received, individuals "Cannot Occupy until C.O. [Certificate of Occupancy] has been issued."  A copy of the July 3, 2008 e-mail Mr. Canfield received from the City of Aurora Building & Permits Department on July 3, 2008 is attached as Exhibit C.

92.     Similarly, according to City of Aurora Building & Permits Department Director Herman Beneke, no individual is permitted to occupy a building within the City of Aurora until a Certificate of Occupancy has been issued.

93.     At approximately the same time, Mr. Canfield also learned the property was subject to several liens.  Defendants Mr. Setork and Mr. Ghassemi were aware of these liens when they presented Mr. Canfield with the rent-to-own lease.

94.     After Mr. Canfield (through his counsel) informed Defendants Mr. Setork and Mr. Ghassemi that no Certificate of Occupancy had been issued, Mr. Setork and employees of Cross Lander came to the premises to perform work on the premises.

95.     Mr. Canfield would not have signed the rent-to-own lease had he known the City of Aurora Building & Permits Department had not issued a Certificate of Occupancy for the premises or if he had known that the premises were subject to liens.

96.     Defendants Mr. Setork's and Mr. Ghassemi's conduct in presenting Mr. Canfield with the rent-to-own lease with knowledge the premises could not be occupied and was subject to liens constitutes fraud rendering the rent-to-own lease void, voidable by Mr. Canfield and/or breached.

97.     To Mr. Canfield's knowledge, the City of Aurora Building & Permits Department has not issued a Certificate of Occupancy for the premises to date.

**COUNT I**
**Violation of the Illinois Wage Payment and Collection Act**
**Against Defendants Cross Lander and Mr. Setork**

98.     Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

99.     At all relevant times herein, Defendants Cross Lander and Mr. Setork were "employers" as defined in the IWPCA, 820 ILCS 115/1 *et seq.*; and Mr. Canfield was an "employee" within the meaning of that Act.

100.    Defendants Cross Lander and Mr. Setork promised to pay Mr. Canfield certain wages and commissions for all work performed.

101.    Defendants Cross Lander and Mr. Setork violated the IWPCA by failing to pay Mr. Canfield for all the work he performed.

102.    Mr. Canfield was damaged by Defendants Cross Lander's and Mr. Setork's violations of the IWPCA.

## COUNT II
### Retaliation in Violation of the Illinois Wage Payment and Collection Act
### Against All Defendants

103.    Mr. Canfield repleads the allegations contained in all paragraphs of this

Complaint, and incorporates them by reference as if fully set forth herein.

104.    The IWPCA prohibits individuals from retaliating against anyone who

opposes conduct reasonably believed to be unlawful under the IWPCA.

105.    Mr. Canfield opposed conduct by Defendants Cross Lander and Mr.

Setork that he reasonably believed was unlawful under the IWPCA.

106.    Defendants Cross Lander, Mr. Setork and Mr. Ghassemi retaliated against

Mr. Canfield for opposing conduct that Mr. Canfield reasonably believed was unlawful

under the IWPCA.

107.    In retaliating against Mr. Canfield, Defendants acted willfully, maliciously

and in wanton disregard for Mr. Canfield's rights.  Exemplary damages are warranted

to prevent similar unlawful conduct by Defendants as well as others.

108.    Mr. Canfield was damaged by Defendants' retaliatory conduct in violation

of the IWPCA.

## COUNT III
### Retaliation in Violation of the Illinois Minimum Wage Law
### Against All Defendants

109.    Mr. Canfield repleads the allegations contained in all paragraphs of this

Complaint, and incorporates them by reference as if fully set forth herein.

110.    At all relevant times herein, Defendants Cross Lander and Mr. Setork

were "employers" as defined in the IMWL, 820 ILCS § 105/1 et *seq*. and Mr. Canfield

was an "employee" within the meaning of the IMWL.

111.    The IMWL prohibits individuals from retaliating against anyone who opposes conduct reasonably believed to be unlawful under the IMWL.

112.    Mr. Canfield opposed conduct by Defendants Cross Lander and Mr. Setork that he reasonably believed was unlawful under the IMWL.

113.    Defendants Cross Lander, Mr. Setork and Mr. Ghassemi retaliated against Mr. Canfield for opposing conduct that Mr. Canfield reasonably believed was unlawful under the IMWL.

114.    In retaliating against Mr. Canfield, Defendants acted willfully, maliciously and in wanton disregard for Mr. Canfield's rights.  Exemplary damages are warranted to prevent similar unlawful conduct by Defendants as well as others.

115.    Mr. Canfield was damaged by Defendants' retaliatory conduct in violation of the IMWL.

### COUNT IV
### Retaliation in Violation of the Public Policy of the IWPCA and IMWL
### Against All Defendants

116.    Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

117.    The public policy of the IWPCA and the IMWL prohibits individuals from retaliating against anyone who opposes conduct reasonably believed to be unlawful under the IWPCA and/or the IMWL.

118.    Mr. Canfield opposed conduct by Defendants Cross Lander and Mr. Setork that he reasonably believed was unlawful under the IWPCA and the IMWL.

119.    Defendants Cross Lander, Mr. Setork and Mr. Ghassemi retaliated against Mr. Canfield for opposing conduct that Mr. Canfield reasonably believed was unlawful under the IWPCA and/or the IMWL.

120.    In retaliating against Mr. Canfield, Defendants acted willfully, maliciously and in wanton disregard for Mr. Canfield's rights.  Exemplary damages are warranted to prevent similar unlawful conduct by Defendants as well as others.

121.    Mr. Canfield was damaged by Defendants' retaliatory conduct in violation of the public policy of the IWPCA and the IMWL prohibiting retaliation.

**COUNT V**
**Race Discrimination (Hostile Work Environment) In Violation Of CRA of 1866, Section 1981 Against Defendants Cross Lander and Mr. Setork**

122.    Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

123.    Section 1981 of the CRA of 1866, as amended, prohibits employers from subjecting their employees to a hostile work environment based on race or color.

124.    Defendants Cross Lander and Mr. Setork created a hostile work environment for Mr. Canfield during his employment with those Defendants.  Mr. Setork's harassing behavior was severe and pervasive.

125.    Mr. Canfield's race (African-American) was a motivating factor in the harassing behavior by Mr. Setork that Mr. Canfield experienced.

126.    The hostile work environment Mr. Canfield experienced constitutes a continuing violation and was not a discrete act.

127.    Mr. Canfield took reasonable steps to oppose the harassment he was

experiencing.  Although Defendants Cross Lander and Mr. Setork were on notice of the harassment Mr. Canfield was experiencing, they failed to take prompt and effective remedial action sufficient to prevent the harassment from continuing.

128.    The actions of the Defendants Cross Lander and Mr. Setork were willful, intentional and/or done maliciously or with reckless indifference to Mr. Canfield's federally protected rights.  Exemplary damages are warranted to prevent similar unlawful conduct by Defendants Cross Lander and Mr. Setork, as well as others.

129.    Mr. Canfield was damaged by Defendants Cross Lander's and Mr. Setork's subjecting Mr. Canfield to a hostile work environment.

**COUNT VI**
**Race Discrimination (Unequal Terms & Conditions of Employment) In Violation Of CRA of 1866, Section 1981, Against Defendants Cross Lander and Mr. Setork**

130.    Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

131.    Section 1981 of the CRA of 1866, as amended, prohibits employers from denying employees equal terms, conditions, benefits or privileges of employment based on race or color.

132.    Mr. Canfield was denied equal terms, conditions, benefits or privileges of employment based on his race or color.

133.    The actions of the Defendants Cross Lander and Mr. Setork in denying Mr. Canfield equal terms, conditions, benefits or privileges of employment because of his race or color were willful, intentional and/or done maliciously or with reckless indifference to Mr. Canfield's federally protected rights.  Exemplary damages are

24

warranted to prevent similar unlawful conduct by Defendants Cross Lander and Mr. Setork, as well as others.

134.    Mr. Canfield was damaged by Defendants Cross Lander's and Mr. Setork's denying Mr. Canfield equal terms, conditions, privileges and benefits of employment based on his race or color.

<div align="center">

**COUNT VII**
**Race Discrimination (Termination of Employment) In Violation Of CRA of 1866, Section 1981, Against Defendants Cross Lander and Mr. Setork**

</div>

135.    Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

136.    Section 1981 of the CRA of 1866, as amended, prohibits employers from terminating an employee's employment based on race or color.

137.    Mr. Canfield's race (African-American) was a motivating factor in the termination of his employment.

138.    The actions of the Defendants Cross Lander and Mr. Setork in terminating Mr. Canfield's employment because of his race or color were intentional and/or done maliciously or with reckless indifference to Mr. Canfield's federally protected rights. Exemplary damages are warranted to prevent similar unlawful conduct by Defendants Cross Lander and Mr. Setork, as well as others.

139.    Mr. Canfield was damaged by Defendants Cross Lander's and Mr. Setork's termination of Mr. Canfield's employment.

## COUNT VIII
### Retaliation In Violation Of CRA of 1866, Section 1981
### Against All Defendants

140.    Mr. Canfield repleads the allegations contained in all paragraphs of this
Complaint, and incorporates them by reference as if fully set forth herein.

141.    The CRA of 1866, Section 1981, prohibits individuals from retaliating
against anyone who opposes conduct reasonably believed to be unlawful under the
CRA of 1866.

142.    Mr. Canfield opposed conduct by Defendants he reasonably believed was
unlawful the CRA of 1866.

143.    Defendants Cross Lander, Mr. Setork and Mr. Ghassemi retaliated against
Mr. Canfield for opposing conduct that Mr. Canfield reasonably believed was unlawful
under the CRA of 1866.

144.    In retaliating against Mr. Canfield, Defendants acted willfully, maliciously
and in wanton disregard for Mr. Canfield's federally protected rights.  Exemplary
damages are warranted to prevent similar unlawful conduct by Defendants as well as
others.

145.    Mr. Canfield was damaged by Defendants' retaliatory conduct in violation
of the CRA of 1866, Section 1981.

## COUNT IX
### Conspiracy In Violation Of CRA of 1866, Section 1985
### Against All Defendants

146.    Mr. Canfield repleads the allegations contained in all paragraphs of this
Complaint, and incorporates them by reference as if fully set forth herein.

147.    The CRA of 1866, Section 1985, makes it unlawful for two more persons to conspire for the purpose of injuring an individual or his property for lawfully attempting to enforce the rights of any person to equal protection of the laws.

148.    Defendants, through their concerted action, conspired to discriminate and/or retaliate against Mr. Canfield.

149.    In conspiring against Mr. Canfield, Defendants acted willfully, maliciously and in wanton disregard for Mr. Canfield's federally protected rights. Exemplary damages are warranted to prevent similar unlawful conduct by Defendants as well as others.

150.    Mr. Canfield was damaged by Defendants' unlawful conduct in violation of the CRA of 1866, Section 1985.

## COUNT X
### Neglect And Refusal To Act In Violation Of The CRA of 1866, Section 1986 Against All Defendants

151.    Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

152.    The CRA of 1866, Section 1986, makes it unlawful for any individual having power to prevent or aid in preventing a violation of the CRA of 1866, Section 1985 to neglect or refuse to do so.

153.    Defendants had within their power the ability to prevent or aid in preventing a violation of the CRA of 1866, Section 1985, and neglected or failed to do so.

154.    In failing to prevent a violation of the CRA of 1866, Section 1985, Defendants acted willfully, maliciously and in wanton disregard for Mr. Canfield's

federally protected rights. Exemplary damages are warranted to prevent similar unlawful conduct by Defendants as well as others.

155.    Mr. Canfield was damaged by Defendants unlawful conduct in violation of the CRA of 1866, Section 1986.

## COUNT XI
### Claim For Rescission Of Rent-To-Own Lease Under Illinois Common Law Against Defendants Mr. Setork and Mr. Ghassemi

156.    Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

157.    Defendants Mr. Setork's and Mr. Ghassemi's conduct in leasing the premises to Mr. Canfield without having first obtained a Certificate of Occupancy makes the contract voidable by Mr. Canfield or void.

158.    Mr. Canfield seeks to rescind the rent-to-own lease. Mr. Canfield was damaged and has no remedy at law.

## COUNT XII
### Claim For Default Judgment Voiding Rent-To-Own Lease Under Illinois Common Law Against Defendants Mr. Setork and Mr. Ghassemi

159.    Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

160.    Defendants Mr. Setork's and Mr. Ghassemi's conduct in leasing the premises to Mr. Canfield without having first obtained a Certificate of Occupancy makes the contract voidable by Mr. Canfield or void.

161.    Mr. Canfield seeks to void the rent-to-own lease. Mr. Canfield was damaged and has no remedy at law.

## COUNT XIII
### Claim For Fraudulent Inducement Under Illinois Common Law
### Against Defendants Mr. Setork and Mr. Ghassemi

162.    Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

163.    Defendants Mr. Setork's and Mr. Ghassemi's conduct in leasing the premises to Mr. Canfield without having first obtained a Certificate of Occupancy makes the contract voidable by Mr. Canfield or void.

164.    Defendants Mr. Setork and Mr. Ghassemi, by offering Mr. Canfield the rent-to-own lease, misrepresented the fact that Mr. Canfield was permitted to occupy the premises when he was not permitted to occupy the premises.

165.    Mr. Canfield relied on Defendants Mr. Setork's and Mr. Ghassemi's misrepresentations in signing the rent-to-own lease and continuing to perform obligations under it.

166.    As a result of Defendants Mr. Setork's and Mr. Ghassemi's misrepresentations, Mr. Canfield was damaged.

## COUNT XIV
### Breach Of The Rent-To-Own Lease Under Illinois Common Law
### Against Defendants Mr. Setork and Mr. Ghassemi

167.    Mr. Canfield repleads the allegations contained in all paragraphs of this Complaint, and incorporates them by reference as if fully set forth herein.

168.    Defendants Mr. Setork and Mr. Ghassemi breached the rent-to-own lease by, among other things, failing to obtain a Certificate of Occupancy.

169.    As a result of Defendants Mr. Setork and Mr. Ghassemi's conduct, Mr.

Canfield was damaged.

## COUNT XV
### Claim For Fraud Under Illinois Common Law
### Against Defendants Mr. Setork and Mr. Ghassemi

170.    Mr. Canfield repleads the allegations contained in all paragraphs of this

Complaint, and incorporates them by reference as if fully set forth herein.

171.    Defendants Mr. Setork's and Mr. Ghassemi's conduct in leasing the

premises to Mr. Canfield without having first obtained a Certificate of Occupancy

makes the contract voidable by Mr. Canfield or void.

172.    Defendants Mr. Setork and Mr. Ghassemi knowingly misrepresented the

fact that Ms. Canfield was permitted to occupy the premises by offering Mr. Canfield

the rent-to-own lease.

173.    Defendants Mr. Setork and/or Mr. Ghassemi knew no individual was

permitted to occupy the premises without a Certificate of Occupancy when they offered

the rent-to-own lease to Mr. Canfield.

174.    Mr. Canfield relied on Defendants Mr. Setork's and Mr. Ghassemi's

misrepresentations that he was permitted to occupy the premises.

175.    As a result of Defendants Mr. Setork's and Mr. Ghassemi's

misrepresentations, Mr. Canfield was damaged.

### <u>RELIEF SOUGHT – ALL COUNTS</u>

**I.    Temporary Restraining Order To Cease Post-Employment Retaliation**

Mr. Canfield seeks a temporary restraining order to cease post-employment retaliation

as requested in his Emergency Motion for Temporary Restraining Order.

## II.    Injunctive Relief To Cease Unlawful Race Discrimination

Defendants' unlawful racially discriminatory and retaliatory conduct must be attacked

from several directions.  Accordingly, Mr. Canfield respectfully requests that the Court

enter an order declaring Defendants violated the CRA of 1866, Sections 1981, 1985 and

1986 and directing that Defendant:

a)  Conduct training for all managers regarding racial harassment, Defendant's policy regarding racial harassment, and retaliation;

b)  Conduct training regarding how to prevent hidden and overt bias (including stereotypes) from impeding the advancement of African-Americans in the workplace;

c)  Forbid future violations of the CRA of 1866 and other laws prohibiting race discrimination and retaliation in the workplace;

d)  Adopt policies aimed at preventing and remedying any future violations that may occur, including an *effective* reporting procedure and *effective* investigation procedures that prevent retaliation; and,

e)  Notify employees of the violation(s) and the remedy imposed by this Court.

## III.    Other Relief As The Court Deems Just And Equitable

Mr. Canfield also respectfully requests that the Court order other monetary and/or

equitable relief, including, but not limited to:

f)  Enjoining Defendants from further unlawful conduct;

g)  Payment of wages Mr. Canfield earned but was not paid;

h)  Declaratory judgment declaring the rent-to-own lease void;

i)  Lost past and future wages (including benefits), compensatory damages, and punitive damages (including, if available, the formula set forth in 820 ILCS § 105/12(a));

j)  Other monetary expenses incurred by Mr. Canfield as a result of Defendant's conduct (including expenses incurred in relocating);

k)  Other contractual damages available under law;

l)  Pre-judgment interest allowed by law (including at the statutory rate pursuant to 815 ILCS § 205/2);

m) Attorney fees and costs (including any expert witness fees); and,

n)  All other and relief that the Court may deem equitable, just or appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues raised in this Complaint.


Respectfully submitted,

/s/ J. Bryan Wood

_____
                    J. Bryan Wood
                    Attorney for Plaintiff

J. Bryan Wood  (No. 6270845)
THE LAW OFFICE OF J. BRYAN WOOD
53 W. Jackson Blvd., Ste. 660
Chicago, Illinois 60604
Telephone:  (312) 545-1420
Facsimile:  (312) 577-0749
Email:  bryan@jbryanwoodlaw.com

Electronically filed on July 28, 2008

08CV4264
JUDGE CONLON
MAGISTRATE JUDGE MASON
YM

# Exhibit A

## <u>INSTALLMENT REAL ESTATE SALE CONTRACT</u>

THIS AGREEMENT, made this 31st day of October, 2007, by and between Mathew Setork and Mahmood Ghassemi, hereinafter referred to as "Seller," and Torey T. Canfield, hereinafter referred to as "Buyer."

1. <u>Sale</u>. Seller agrees to sell, and Buyer agrees to buy the following described real estate located in Kane County, Illinois, to-wit:

(legal description may be inserted by buyer or seller's attorney)

commonly known as 1161 Pearl, Aurora, Illinois, and hereinafter called the "premises."

2. <u>Conveyance</u>. Seller agrees that if Buyer shall first make the payments and perform the covenants, agreements and conditions on his part hereinafter set forth, that the Seller shall convey to the Buyer, in fee simple, clear of all encumbrances whatever, except as hereinafter provided, by a good and sufficient Warranty Deed, the said premises, subject to the conditions hereafter stated.

3. <u>Title Conditions</u>. The conveyance to be made by the Seller to the Buyer shall be expressly subject to the following:

(a) All taxes, special assessments and special taxes levied after the year 2006 and installments of special assessments due and payable after closing date.

(b) The rights of all persons claiming by, through or under the Buyer, and acts done or suffered by, and judgments against the Buyer.

(c) The usual, customary and standard objections and general exceptions to title as are contained in the title insurance policies issued by a title insurance company.

(d) All easements, covenants and restrictions of record.

(e) Zoning and building ordinances and other governmental limitations that may affect the use of the premises.

4. <u>Purchase Price</u>. Buyer agrees to pay to Seller as the full purchase price for said premises, at such place as may be specified by Seller, the sum of approximately $249,900.00, such sum to be due and payable as follows:

(a)    The Buyer shall pay the sum of $1500.00 as down payment.

(b)    The remaining balance of the Purchase Price in the sum of $248,900.00, together with interest on the balance from time to time remaining, at the rates hereinafter mentioned, shall be payable as follows:

Commencing November 1, 2007, and continuing on the first day of each month thereafter, for a total of 24 months, monthly installments in the sum of approximately $1500.00. On or before December 1, 2009, the entire balance shall be paid in full.

(c)    Installment payments due on the first day of a month shall not be considered overdue or in default if paid by the 10th day of the month. Interest not paid by the 10th day of a month shall be added to principal, along with a late payment penalty equal to 5% each time the monthly installment payment be not paid by the 10th day of a month; and said sums shall bear interest at the same rate as such principal.

(d)    In addition to installments of principal and interest, Buyer shall, on each monthly payment date, deposit a sum in escrow for payment of real estate taxes and insurance, as part of the mortgage payment.

(e)    If Buyer closes by December 1, 2009, then Buyer shall receive $10,000.00 credit at closing. Failure to close by December 1, 2009 shall cause all money and security deposit/earnest money to be forfeited to Seller.

(f)    If Buyer fails to close by December 1, 2009, then Buyer shall pay the sum of $10,000.00 immediately.

5. Title Commitment: The Seller shall obtain, at Seller's expense, and deliver, or cause to be delivered to Buyer, at such time as Buyer has completed the payments hereunder, a title commitment for a title insurance policy issued by a title insurance company in the amount of the purchase price, covering title to the premises and showing title in the Seller subject only to the title exceptions set forth in Paragraph 3. The title commitment shall be conclusive evidence of good title as therein shown as to all matters insured by the policy, subject only to the exceptions as therein stated. If the title commitment discloses unpermitted exceptions, Seller shall have thirty (30) days fro the date of delivery thereof to have the exceptions removed from the commitment or to have the title insurer commit to insure against loss or damage that my be occasioned by such exceptions. At the request of Buyer made at closing, Seller shall forthwith obtain such title commitment, and deliver the same to Buyer within thirty (30) days after closing. Thereafter, Seller shall have no further expense with regard to such title commitment except for the charges incurred to clear any exceptions or obligations incurred by the act, omissions, or conditions suffered by the Seller. The title commitment provided herein shall be at Seller's expense, but any later date title commitment shall be at Buyer's expense.

6. Liens. The Buyer shall not and will not suffer nor permit any mechanic's liens or other lien to attach to, or be against or upon the premises sold hereunder, which shall or may be superior to the rights of the Seller.

7. Alterations and Improvements. Buyer agrees not to make, nor contract to make, any material alterations or improvements exceeding $3,000.00 in value, without first obtaining the written consent of the Seller, which written consent of Seller will not be unreasonably withheld. Buyer agrees to keep the premises and improvements in good repair and neat and orderly condition and to comply with all ordinances and lawful regulations or public authority, including Kane County building, zoning and health ordinances, to keep all weeds cut and brush and fallen limbs cleared.

8. Assignment. The Buyer shall not transfer nor assign this agreement, or any of its interest therein, and no transfer or assignment shall be made by the Buyer without the previous written consent of the Seller. Any such assignment or transfer, without such previous written consent, shall not vest in the transferee or assignee any right, title or interest therein or hereunder or in said premises, but shall render this agreement null and void, at the election of the Seller; and the Buyer will not lease said premises, except to individual apartment tenants, for any purpose, except upon the previous written consent of the Seller, but the Seller's consent shall not be unreasonably withheld. No assignment shall relieve or release the Buyer from his personal obligation hereunder.

9. Vesting of Title. No right, title or interest, legal or equitable, in the premises aforesaid, or any part thereof, shall vest in the Buyer until the delivery of the Deed aforesaid by the Seller, or until the full payment of the purchase price at the times and in the manner herein provided.

10. Modification. No extensions, change, modification or amendment to or of this instrument of any kind whatsoever shall, or will be made or claimed by the Buyer, and no notice of any extension, change, modification or amendment made or claimed by the Buyer, shall have any force or effect whatsoever except the same shall be endorsed in writing on this Agreement and be signed by the parties hereto.

11. Insurance. The Seller shall keep all buildings at any time on said premises insured at its expense against loss by fire, and extended coverage risks in an amount at least equal of the sum remaining unpaid hereunder and not less than 80% of the insurable value thereof, which insurance, together with all additional insurance, shall require all payments for loss to be applied on said indebtedness covering the parties as their interests may appear, and Seller shall deliver the said policies of insurance to the Buyer. Buyer shall be added as an additional insured. Presently held insurance policies shall be assigned to Buyer, endorsed to show coverage of the parties as their interests may appear, and prepaid premiums shall be prorated at the time of closing. The Buyer shall also perform its obligations to insure, as herein provided, by making the monthly payments for insurance as required under Paragraph 17 below.

12. <u>Forfeiture</u>. In case of the failure of the Buyer to make any of the payments, or any part thereof, or perform any of the covenants hereof on Buyer's part hereby made and entered into, this agreement shall, at the option of the Seller, be forfeited and determined, and the Buyer shall forfeit all payments made by Buyer pursuant to this agreement, and such payments shall be retained by the Seller in full satisfaction of, and as liquidated damages by, Seller sustained; and in such event, the Seller shall have the right to re-enter and take possession of the premises aforesaid. Immediately, upon the service of any declaration or notice of forfeiture, and regardless of any period of time therein, herein or by law specified for the effect of such declaration or notice, all rentals due and accruing from the premises, and all parts thereof, shall be considered to be due to and collectible by the Seller, and are hereby irrevocably assigned by Buyer to Seller.

13. <u>Title to Improvements</u>. In the event of the termination of this agreement by lapse of time, forfeiture or otherwise, all improvements, whether finished or unfinished, on the premises aforesaid, which may be put upon or on said premises by the Buyer, shall belong to and be the property of the Seller without liability or obligation on Seller's part to account to the Buyer therefor, or for any part thereof.

14. <u>Legal Expenses</u>. The Seller shall and will pay to the Buyer all reasonable costs and expenses, including attorney's fees, incurred by the Buyer in any action or proceeding to which Buyer may be made a party by reason of being a party to this agreement, and the Seller shall pay to the Buyer all costs and expenses, including attorney's fees, incurred by the Buyer in enforcing any of the covenants and provisions of this agreement and incurred in any action brought by Buyer against the Seller on account of the provisions hereof, and all such costs, expenses and attorney's fees may be included in and form a part of any judgment entered in any proceeding brought by the Buyer against the Seller on or under this agreement.

The Buyer shall and will pay to the Seller all reasonable costs and expenses, including attorney's fees, incurred by the Seller in any action or proceeding to which Seller may be made a party by reason of being a party to this agreement, and the Buyer shall pay to the Seller all costs and expenses, including attorney's fees, incurred by the Seller in enforcing any of the covenants and provisions of this agreement and incurred in any action brought by Seller against the Buyer on account of the provisions hereof, and all such costs, expenses and attorney's fees may be included in and form a part of any judgment entered in any proceeding brought by the Seller against the Buyer on or under this agreement.

15. <u>Remedies</u>. The remedy of forfeiture herein given to the Seller shall not be exclusive of any other remedy, but the Seller shall, in case of default or breach, or for any other reason herein contained, have every other remedy given by this agreement and by law or equity, and shall have the right to maintain and prosecute any and every such remedy, contemporaneously and otherwise, with the exercise of the right of forfeiture, or any other right herein given.

16. <u>Non-Waiver</u>. No failure, or repeated failure, on the part of Seller to enforce or to require strict and literal compliance by Buyer of any one or more of the covenants or

agreements of the Buyer contained herein shall constitute or be deemed a waiver thereof, and no advance or prior notice shall be deemed a condition precedent to the Seller's insistence upon the requirement that Buyer keep, perform and comply with all and every covenant and agreement herein contained.

17.    Possession, Taxes and Insurance.    Possession of said premises shall be delivered to Buyer on or before October 1, 2007. The Seller shall pay, prior to the past due date or dates, all of the general real estate taxes and other assessments levied or assessed against the said premises for the year 2006 and shall exhibit to Buyer receipts showing payments therefor. The general real estate taxes and other assessments levied or assessed against the premises for the year 2007 shall be prorated to the date of possession. The Seller shall pay from escrow, prior to the past due date or dates in each year, all of the real estate taxes and other assessments levied or assessed against the said premises, including Buyer's portion of the general real estate taxes for the year 2007. Buyer shall deposit monthly with Seller a sum equal to one-twelfth (1/12) of the most recent tax bill on the premises, which sums shall be held in escrow by Seller, without interest, and used to pay tax bills when received. If the escrowed sum is insufficient, Buyer will, on request, immediately pay the insufficiency. Any amount advanced by Seller to pay taxes if not repaid within thirty (30) days, shall be added as additional principal due under this agreement as of the first day of the month in which Seller makes such advance, and shall bear interest at the rate herein specified. Buyer shall also deposit monthly with Seller a sum equal to one-twelfth (1/12) of the most recent annual insurance premium, which sum shall be held in escrow by Seller in the same manner, and any amount advanced by Seller to pay the insurance premiums shall likewise be added as additional principal hereunder.

18.    Code Violations.    Seller warrants to Buyer that no notice from any city, village or other governmental authority or any dwelling code violations have heretofore been issued and received by the owner or his agent with respect to any dwelling structure on said real estate.

19. Notices. All notices and demands necessary or desirable to be given hereunder shall be in writing and delivered in person or sent by certified or registered mail, if for Seller, addressed to 111 S. Lake St., Montgomery, Illinois, or to such place as the Seller may from time to time advise; and if for Buyer, addressed to 1161 Pearl, Aurora, Illinois, or to such other address as is stated in a notice given in compliance herewith.

20.    Time of Essence.    It is agreed between the Seller and the Buyer that time shall be of the essence of this agreement.

21.    Successors.    The covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators, successors and assigns of the respective parties.

22.    Recording Agreement.    This Agreement or any Memorandum thereof may be recorded in the Recorder's Office of the county wherein the property is located.

23.  Termite Inspection and Survey.  Any termite inspection or survey shall be incurred at Seller's expense at time of final closing.

24.  Condemnation and/or Easement.  If the subject property is ever condemned by any governmental entity and/or an easement is granted on said property any money received from said condemnation and/or easement shall be immediately turned over to the Seller and applied towards the principal.  If said money does not pay off the contract balance in full then said monthly payment of principal and interest on the contract shall be adjusted accordingly.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the day and year first above written.

BUYERS:                          SELLERS:

```
08CV4264
JUDGE CONLON
MAGISTRATE JUDGE MASON
YM
```

# Exhibit B

# RENT TO OWN
## PAYMENTS FOR 24 MONTHS!
### For 1161 Pearl St. Aurora IL, 60505

| Payment | Credit | Description | Renter | Owner | Date |
|---------|--------|-------------|--------|-------|------|
| $1500 | — | House Payment | TC | MK | 1/1/08 |
| $1500 | — | House Payment | TC | MK | 2/1/08 |
| $1500 | — | House Payment | TC | MK | 3/1/08 |
| $1500 | — | House Payment | TC | MK | 4/1/08 |

08CV4264
JUDGE CONLON
MAGISTRATE JUDGE MASON
YM

# Exhibit C

**Warren, Nancy**

**From:** Janine_Mair/Aurora@COA.AURORA-IL.ORG on behalf of Issue_Manager@COA.AURORA-IL.ORG

**Sent:** Thursday, July 03, 2008 2:03 PM

**To:** Warren, Nancy

**Subject:** Notice: COAC-7G7KFM - Status Change (Closed)

This Issue is CONFIDENTIAL.

7/3/2008 02:03 PM - Janine Mair/Aurora
Status Change
Previous: Open
New: Closed7/3/2008 02:02 PM - Janine Mair/Aurora Action Taken: All building inspections are approved. No final Engineering approval. Certificate of Occupancy has not been issued. Cannot Occupy until C.O. has been issued.

If using a browser, you may view the original issue by clicking on the following URL -
http://coacs.coa.aurora-il.org/PRO/Service/NSF/pa_Service?OpenPage&COAC-7G7KFM

Issue Number: COAC-7G7KFM

Contact Information
Name: TOREY CANFIELD
Address: 1161 PEARL ST , AURORA IL USA
Home Phone: 6308598589
Work Phone:

Location Information
Address: 1161 PEARL ST , AURORA IL USA

Issue Information
Priority: High
Status: Closed
Assignee: Janine Mair
Issue Type/SubType: FOIA/Building and Permits
Department/Unit: Community Development/Building and Permits
DueDate: 7/3/2008 11:52:00 AM
Description:
What type of information are you requesting?... SEE ATTACHMENT AND DOWNLOAD

Action History:
-----------------------------------------------
7/3/2008 02:03 PM - Janine Mair/Aurora
Status Change
Previous: Open
New: Closed
Logged:7/3/2008 2:03:09 PM
-----------------------------------------------
7/3/2008 02:02 PM - Janine Mair/Aurora
Action Taken: All building inspections are approved. No final Engineering approval.
Certificate of Occupancy has not been issued. Cannot Occupy until C.O. has been issued.
Logged:7/3/2008 2:02:56 PM