**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TOREY T. CANFIELD, | Case No.  08-CV-04264 |
| Plaintiff, | Judge Suzanne B. Conlon |
| v. | Mag. Judge Michael T. Mason |
| MATHEW SETORK, CROSSLANDER OF MONTGMERY, INC., and MAHMOOD GHASSEMI, | **Jury Trial Demanded** |
| Defendants. | |

<u>**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**</u>

Plaintiff TOREY T. CANFIELD, by and through his attorney and pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and with due and proper notice to counsel for Defendants, hereby moves for a Temporary Restraining Order against Defendants MATHEW SETORK, CROSS LANDER OF MONTGOMERY, INC., and MAHMOOD GHASSEMI (collectively "Defendants"), as follows:

<u>**BACKGROUND**</u>

1.      Throughout Torey Canfield's employment with Cross Lander of Montgomery, Inc., he was forced to endure racially disparaging comments against African-Americans from Mathew Setork (Caucasian) – the owner of Cross Lander of Montgomery, Inc.  Mr. Setork's conduct rose to the level of a racially hostile work environment during the final months of Mr. Canfield's employment.  Ultimately, Mr.

Setork refused to pay Mr. Canfield wages he was owed and unlawfully terminated his employment based on his race and/or because he opposed unlawful conduct.  Worse for Mr. Canfield, after his termination Mr. Setork – with the help of his business partner, Mahmood Gassemi – retaliated against Mr. Canfield by, among other things, taking steps to have Mr. Canfield evicted from his home.

2.    This lawsuit arises under the Civil Rights Act of 1866, as amended, 42 U.S.C. §§ 1981, 1985, and 1986, ("CRA of 1866").  This lawsuit also arises under the Illinois Wage Payment and Collection Act, 820 ILCS § 115/1 *et seq.* ("IWPCA"), for Defendants' failure to pay earned wages to Mr. Canfield.  This lawsuit also arises under the Illinois Minimum Wage Law, 820 ILCS §105/1 *et seq.* ("IMWL") and the public policy of the IMWL and IWPCA that prohibits retaliation against individuals who assert their rights to collect wages owed under law.  This lawsuit also arises under Illinois common law relating to breach of contract, fraudulent inducement, and fraud.  Mr. Canfield anticipates requesting leave to add additional claims relating to discrimination after exhausting administrative remedies.

3.    Mr. Canfield's request for a Temporary Restraining Order relates solely to Defendants' post-employment retaliatory conduct.  Pertinent to the matters at hand here, Mr. Canfield asserts the following claims in his Complaint:

➢    **Counts II – IV**:  retaliation (including post-employment retaliation) under the IMWL, the IWPCA and the public policy preventing retaliation for raising wage claims under Illinois law; and

➢ **Count VIII**: retaliation (including post-employment retaliation) in violation of the Civil Rights Act of 1866, Section 1981.

4. After Mr. Canfield's termination of employment, Mr. Canfield (through his attorney) placed Defendants on notice of his intent to pursue claims of unlawful discrimination and unpaid wages via letters dated June 10, 2008 and June 24, 2008. Defendants Cross Lander and Mr. Setork received the letters from Mr. Canfield's June 10, 2008 letter (from his counsel) on June 12, 2008 and June 17, 2008 respectively. Defendants Cross Lander and Mr. Setork received Mr. Canfield's June 24, 2008 letter (from Mr. Canfield's counsel) on June 24, 2008 (through their counsel, James Jensen). *See* Declaration of Torey T. Canfield (filed herewith).

5. Within days of receiving the aforementioned letters, Defendants engaged in a concerted campaign of retaliation relating to Mr. Canfield's home and credit rating. Defendants campaign of retaliation included the following:

- On June 23, 2008, Defendant Mr. Setork attempted to increase Mr. Canfield's financial obligations by refusing to pay Mr. Canfield's water bill and attempting to have the water bill transferred into Mr. Canfield's name. Prior to that time, by agreement with Mr. Canfield and their customary practice, Mr. Setork had paid the water bill for the premises.

- On June 25, 2008, Defendants Mr. Setork and Mr. Ghassemi (through their counsel, Jay R. Wyeth) served Mr. Canfield with a "Notice of Intention to Declare Forfeiture of All Rights Under Installment Real Estate Contract And Notice of Intention to File Forcible Detainer Suit" ("the Notice of

3

- At some point approximately on or after July 1, 2008, using supplies, resources and/or property owned by Defendant Cross Lander, Defendants Mr. Setork and/or Mr. Ghassemi, falsely informed a credit reporting agency or agencies that Mr. Canfield had become more than 120 days behind on his rental payments.  Prior to July 1, 2008, however, Defendants had not reported that Mr. Canfield was 30, 60 or 90 days past due.

*See* Declaration of Torey T. Canfield and exhibits (filed herewith).

6.    Defendants' primary motivation in taking these actions was to retaliate against Mr. Canfield for opposing Defendants Cross Lander's and Mr. Setork's unlawful conduct.  Defendants, acting in concert, wanted to make Mr. Canfield's life more difficult by increasing his financial burdens and/or preventing him from being able to maintain stable housing and/or funds necessary for him to maintain basic life necessities.

7.    Subsequently, Mr. Canfield learned that no "Certificate of Occupancy" was ever issued for the premises.  Thus, he and his family have no choice but to relocate.  *See* Declaration of Torey T. Canfield at Exhibit J.  Mr. Canfield's need to relocate makes Defendants' conduct more injurious and Mr. Canfield faces irreparable harm of Defendants' retaliatory conduct continues.

4

## ARGUMENT

8.     Plaintiff asks that the Court to bring any and all illegal retaliatory conduct by Defendants to an immediate end by issuing a Temporary Restraining Order ("TRO") that enjoins Defendants from any retaliation, from continuing its efforts to evict Mr. Canfield from his residence, or from making any reports to any credit reporting service regarding Mr. Canfield.

9.     Federal courts generally apply a two-step analysis in deciding whether to issue a TRO.  First, the Court determines if there is (a) a likelihood of success on the merits, (b) a threat of irreparable harm, and (c) an inadequate remedy at law.  If those conditions are satisfied, the Court then (e) balance the hardships and (f) consider the impact on public interest.  *Illusions Too Reality, LLC v. City of Harvey*, 2003 U.S. Dist. LEXIS 1530, at *11 (N.D. Ill. Feb 4, 2003).

10.     The likelihood of success need only be better than negligible.  *See Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982).  Irreparable injury is a harm that cannot be prevented or fully rectified by final judgment after trial. *Roland Machine Co. v. Dresser Indus., Inc.* 749 F.2d 380, 386 (7th Cir. 1984).

11.     Mr. Canfield's circumstances warrant issuing a TRO.  Absent protection by a Temporary Restraining Order, Mr. Canfield will suffer irreparable injury to his health and safety.  If evicted from his apartment in retaliation for asserting his right to be free from discrimination or collect wages owed, Mr. Canfield will not be able to maintain the necessities of life (shelter for himself and his family, etc.).

12.     Similarly, if Defendants are permitted to continue to tarnish Mr. Canfield's credit rating through false and inconsistent reports, Mr. Canfield will be unable to obtain housing or borrow funds necessary to cover expenses he can no longer pay as a result of the loss of his job.  Under these circumstances, a Temporary Restraining Order is warranted.  *See Truck Drivers Local 705 v. Almarc Manufacturing, Inc.*, 553 F.Supp. 1170 (N.D. Ill. 1982) (Shadur, J.) (issuing preliminary injunction and findings of irreparable injury where employer refused to reinstate employees who had inadequate income and resources for living expenses).

13.     Because his residence has not been issued a Certificate of Occupancy, Mr. Canfield has no choice but to relocate.  If Defendants efforts to evict Mr. Canfield and/or tarnish his credit rating continue, Mr. Canfield will not be able to secure stable housing.  Already facing difficulties as the result of being unlawfully terminated, Mr. Canfield will be unable to find a landlord who will rent to him if eviction proceedings for alleged non-payment are instituted.  Similarly, Mr. Canfield will not be able to secure a lease – or a loan with which to pay deposits and rental expenses – if Defendants continue damaging Mr. Canfield's credit rating through false reports.  *See* Declaration of Torey T. Canfield.

14.     Mr. Canfield cannot be compensated for being rendered homeless by Defendants' retaliatory efforts to evict him.  Likewise, further damage to Mr. Canfield's credit rating will not lend itself to easy calculation of damages.  Nor will compensating Mr. Canfield for these harms at the end of the parties' litigation enable him to maintain

the necessities of life (shelter, living expenses for food, healthcare, transportation, etc. for himself and his dependents, etc.) during the pendency of the proceeding.

15.    There is more than a negligible chance Mr. Canfield will prevail on his retaliation claims by showing the post-employment retaliation he suffered was causally connected to his opposition to Defendant's unlawful conduct.

16.    The United States Supreme Court recently confirmed that Section 1981 of the CRA of 1866 prohibits retaliation as a form of discrimination.  *See Humphries v. CBOCS West, Inc.*, 128 S.Ct. 1951 (2008).  Section 1985 of the CRA of 1866 also creates liability "if two or more persons conspire … to injure him or his property for lawfully enforcing *or attempting to enforce*, the right of any person, or class of persons, to equal protection of the laws."  42 U.S.C. § 1985(2) (emphasis added).  Thus, Section 1985 also prohibits conspiracy to retaliate.

17.    To prove his post-employment retaliation claims, Mr. Canfield need only show that he engaged in protected activity, that Defendants took action likely to dissuade him from continuing to enforce his rights, and that Defendants actions were causally related to his protected activity.  *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir. 2007), *aff'd* 128 S.Ct. 1951 (2008); *see also Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53 (2006).

18.    Here, Mr. Canfield's opposition to Defendant Cross Lander's and Mr. Setork's racially motivated conduct during his employment and Mr. Canfield's correspondence (through his counsel) indicating his intent to raise claims of race discrimination under Title VII, the Illinois Human Rights Act and/or Section 1981

constitutes protected activity.  Additionally, the conduct by Defendants – acting collectively – described above constitutes conduct that could reasonably be expected to dissuade an individual from pursuing civil rights claims.

19.    The suspicious timing of Defendants' actions alone can constitute sufficient evidence of causation.  *See Lalvani v. Cook Co., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001) ("when an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied").   Here, Defendants' allegedly retaliatory conduct occurred within days of Defendants becoming aware of Mr. Canfield's opposition of Defendants' conduct.

20.    This timing, combined with the inconsistent and inexplicable nature of Defendants' conduct give rise to an inference of retaliatory motive (e.g., Defendants failing to notify the credit agencies when Mr. Canfield's payments on the rent-to-own lease were allegedly 30, 60 or 90 days overdue, failing to request that Mr. Canfield pay any overdue amounts before serving the Notice of Detainer, initiating eviction proceedings while simultaneously attempting to have utilities transferred into Mr. Canfield's name, failing to adjust their claims for amounts allegedly owed in light of Mr. Canfield's evidence of payments, etc.).  *See, e..g, Troupe v. May Department Stores*, 20 F.3d 734-736-37 (7th Cir. 1994); *see also Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720-21 (7th Cir. 2005); *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006).

21.     Thus, with respect to his post-employment retaliation claims, Mr. Canfield is likely to prevail on the merits.

22.     Defendants repeatedly refused to respond to Mr. Canfield's repeated requests to discuss resolution of the parties' issues.  To date, Defendants Mr. Setork and Mr. Ghasemmi have not indicated their willingness to cease their retaliatory conduct.

23.     Specifically, despite repeated requests by Mr. Canfield (through his attorney) to discuss resolution, Defendants counsel have not indicated Defendants will stop taking action to evict Mr. Canfield for failing to pay debts allegedly owed pursuant to the rent-to-own lease**,** even though Mr. Canfield has provided evidence the contract was entered fraudulently and that he has, in fact, made payments under the rent-to-own lease.

24.     Emergency relief is necessary here, regardless of whether Defendants can be afforded the opportunity to be heard.  *See* Fed. R. Civ. P. 65(b).  Nonetheless, Mr. Canfield has provided notice of this Complaint and Emergency Request for Temporary Restraining Order to Defendants through their counsel.

## <u>CONCLUSION</u>

WHEREFORE, for all the above reasons, Plaintiff respectfully requests that this Honorable Court issue a Temporary Restraining Order directing that Defendants (1) not retaliate against Mr. Canfield, (2) cease any actions to evict him from his residence, (3) not make any reports to any credit reporting service regarding Mr. Canfield, and (4) to maintain the status quo ante until such time as this matter can be heard.

Respectfully submitted,

/s/ J. Bryan Wood

_____

J. Bryan Wood
Attorney for Plaintiff

J. Bryan Wood  (No. 6270845)
THE LAW OFFICE OF J. BRYAN WOOD
53 W. Jackson Blvd., Ste. 660
Chicago, Illinois 60604
Telephone:  (312) 545-1420
Facsimile:  (312) 577-0749
Email:  bryan@jbryanwoodlaw.com

Electronically filed on July 28, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TOREY T. CANFIELD,<br><br>      Plaintiff,<br><br>v.<br><br>MATHEW SETORK, CROSSLANDER<br>OF MONTGMERY, INC., and<br>MAHMOOD GHASSEMI,<br><br>      Defendants. | Case No.  08 - CV - 4264<br><br>JUDGE SUZANNE B. CONLON<br><br>MAG. JUDGE MICHAEL T. MASON<br><br>**Jury Trial Demanded** |

## DECLARATION OF TOREY T. CANFIELD IN SUPPORT OF
## EMERGENCY MOTION FOR TEMPORARY RESTRATING ORDER

I, TOREY T. CANFIELD, declare under penalty of perjury under the laws of the

United States of America that the following statements of fact are true and correct:

    1.     I am an African-American over eighteen years of age.

    2.     I am the Plaintiff on whose behalf the Complaint in the above-captioned

matter was filed by my attorney, J. Bryan Wood.

    3.     Cross Lander of Montgomery, Inc. is an automobile and motorcycle

dealership located at 111 South Lake Street, Montgomery, Illinois 60538.

    4.     From approximately May 2006 through May 24, 2008, I was employed by

Cross Lander of Montgomery, Inc. ("Cross Lander") and Mathew Setork.  From

approximately September 2006 until my final termination of employment, I worked as a

Finance Manager.

5.      Mr. Setork is the owner of Cross Lander.  He runs the automobile and motorcycle dealership.  He has the authority to hire, fire, direct and supervise employees.

6.      I believe Mr. Setork is of Persian descent.  He is not African-American.  I believe he is Caucasian.

7.      Mahmood Ghassemi is Mr. Setork's business partner.  I do not know if Mr. Ghassemi is involved in Cross Lander's operations, but he has many business dealings with Mr. Setork.

8.      Mr. Ghassemi is not African-American, but I am not sure of his race.

9.      While working at Cross Lander, on approximately October 31, 2007, I signed a document entitled "Installment Real Estate Sale Contract" ("rent-to-own lease").  When I signed the rent-to-own lease, I understood it was an agreement for me to lease and eventually purchase a home in Aurora, Illinois ("the premises") from Mr. Setork and Mr. Ghassemi.  A copy of the rent-to-own lease is attached as Exhibit A.

10.      I made payments to Mr. Setork which he acknowledged receiving.  A copy of a partial payment log with Defendant Mr. Setork's initials is attached as Exhibit B.

11.      Prior to my termination of employment, Mr. Setork never informed me I was past due on any payments.  Prior to my termination of employment, Mr. Setork never reported me as being 30, 60, 90 or 120 days past due to any credit reporting agency.

12.      In approximately September 2007, Mr. Setork and I agreed to adjust my compensation so I would paid be a salary of $52,000 per year ($1,000/week) plus

2

commissions ($175 for each automobile and $75 for each motorcycle that I sold, $150 for each motorcycle or automobile that I helped finance, $50 per "back-end" item for motorcycles, and $75 per "back-end" item for automobiles). I was paid these wages from approximately September 2007 through the pay period ending prior to May 24, 2008.

13.     During my employment with Cross Lander and Ms. Setork, I was exposed to racially discriminatory and/or harassing comments and conduct by Mr. Setork. I believe I was discriminated against on account of my race (African-American) during my employment. I opposed this discriminatory treatment during my employment, including by complaining to Mr. Setork.

14.     Based on comments he made at the time of my termination (among other things), I believe my race (African-American) and my opposition to Mr. Setork's discriminatory conduct were motivating factors in Mr. Setork's decision to terminate my employment.

15.     On my last day of employment, Mr. Setork refused to pay me in accordance with our wage agreement. I attempted to assert my rights to collect wages I was owed under law, including by demanding Mr. Setork pay me what I was owed. Mr. Setork refused to pay me what I was owed under our agreement and, instead, terminated my employment. I believe my attempt to assert my rights to collect wages owed under law was a motivating factor in Mr. Setork's decision to terminate my employment.

16.     Through letters from my attorney dated June 10, 2008 and June 24, 2008, I placed Mr. Setork and Cross Lander on notice I intended to pursue claims of race discrimination, unpaid wages and retaliation.  A copy of my attorney's letter to Mr. Setork and Cross Lander dated June 10, 2008 (with signature cards showing delivery) is attached as Exhibit C.  A copy of my attorney's letter to James Jensen (Mr. Setork and Cross Lander's attorney) dated June 24, 2008 (with fax receipt confirmation), is attached as Exhibit D.

17.     On approximately Jun 24, 2008, I learned that Mr. Setork attempted to transfer the water bill for the premises into my name.  On approximately June 24, 2008, I received a telephone call from Isabel Kodron from the City of Aurora water department.  Ms. Kodron indicated she had spoken with Mr. Setork by telephone earlier that day and that he was trying to transfer the water bill for the premises into my name. She explained Mr. Setork was unable to do this because Mr. Setork's name was not on the account – Mr. Ghassemi's name was on the account.

18.     During our phone conversation, Ms. Kodron said Mr. Setork asked her to call me to see if I was willing to come down to the water department to transfer the water bill into my name. Ms. Kodron said that if I would not come down, she needed to let Mr. Setork know.  I told her that I would try to come down.

19.     Several days later, I went down to the water department to speak with Ms. Kodron about the situation.  During my conversation with her, she explained she had called Mr. Setork on June 25, 2008 to explain I had not come down to transfer the

4

water bill.  She described her conversation with Mr. Setork as "kind of rough" and said that Mr. Setork said Ms. Kodron should be talking to Mr. Setork's lawyer.

20.     During my visit to the water department, Ms. Kodron also gave me a copy of a letter (and envelope) she had received from Mr. Setork.  The envelope from Cross Lander of Montgomery, Inc. is postmarked June 23, 2008.  A copy of the letter and envelope is attached as Exhibit E.

21.     Additionally, on approximately June 25, 2008, Mr. Setork and Mr. Ghassemi (through their counsel, Jay R. Wyeth) served me with a "Notice of Intention to Declare Forfeiture of All Rights Under Installment Real Estate Contract And Notice of Intention to File Forcible Detainer Suit" ("the Notice of Detainer").  While at home, I heard a knock on door.  When I answered the door, a stranger handed me some papers and told me that the contact information for the attorney was on the back.  He then left.  A copy of the Notice of Detainer I received that day is attached as Exhibit F.

22.     On approximately July 3, 2008, my attorney sent a letter to Mr. Setork, Mr. Ghassemi and Cross Lander (through their counsel) informing them I considered Defendants conduct retaliatory.  A copy of my attorney's letter to James Jensen and Jay R. Wyeth (with fax receipt confirmation) dated July 3, 2008 is attached as Exhibit G.

23.     On approximately July 21, 2008, I learned Mr. Setork and Mr. Ghassemi had reported me as being 120 days past due on the rent-to-own lease.  Prior to that, on or after approximately July 1, 2008, I reviewed a copy of my credit report dated July 1, 2008.  On the report dated July 1, 2008, Mr. Setork and Mr. Ghassemi had not reported me as past due at all.

5

24.    On approximately July 21, 2008, I obtained another copy of my credit report. For security reasons, I am not attaching a copy of full credit report. But the page of each report showing the status of the rent-to-own lease is attached as Exhibit H.

25.    The July 1, 2008 report shows all payments through April as "OK", shows "Pay Status" as "Current" and shows "Past Due" as "$0." The July 21, 2008 report shows all payments through June as "OK," but shows "Pay Status" as "Late 120 Days" and shows "Past Due" as "$9,170."

26.    As a Finance Manager for Cross Lander and Mr. Setork, I am generally familiar with Mr. Setork's practices of reporting past due amounts on loans. Mr. Setork and Cross Lander have access to computer software which allows them to make credit reports to Trans Union. Mr. Setork and Cross Lander usually make these reports at the end of each month. Typically, when payment on a loan is missed and becomes 30 days past due, Mr. Setork and Cross Lander will report it to a credit reporting agency. Mr. Setork and Cross Lander will report the amount past due, the pay status and the months in which payments were missed.

27.    On approximately July 7 or 8, 2008, I learned that the City of Aurora Building & Permits Department had not issued a Certificate of Occupancy for the premises. I received a copy of a report in the mail from the Building & Permits Department. A copy of the report I received is attached as Exhibit J.

28.    The report includes an e-mail from Nancy Warren stating that "Certificate of Occupancy has not been issued" and that individuals "Cannot Occupy until C.O. [Certificate of Occupancy] has been issued."

6

29.    I would not have signed the rent-to-own lease if I had known no Certificate of Occupancy had been issued.

30.    I believe that my opposition to unlawful conduct by Mr. Setork, Mr. Ghassemi and Cross Lander is a motivating factor in Mr. Setork's, Mr. Ghassemi's and Cross Lander's attempts to increase my financial obligations, evict me and damage my credit report by falsely reporting balances owed.

31.    Presently, myself, my son (age 4), my fiancée, and her two children (ages 10 and 12) all reside at the premises. Since learning that no Certificate of Occupancy was issued, I have been looking for a new place for my family to live.

32.    My family and I only intend on continuing to live at the premises until I can find a new place for us to live. Presently, I anticipate being able to find a new place for us to live by September 2008.

33.    In my efforts to find a new place for us to live, I have noticed that many landlords check potential tenants' credit reports. I fear Mr. Setork's, Mr. Ghassemi's and Cross Lander's efforts to falsely damage my credit report will make it more difficult for me to find a place to live.

34.    Additionally, in my efforts to find a new place to live, I have had to answer landlords' questions about whether I have ever been evicted. From what I have seen, this is a common question on virtually all residential applications. I believe that if I have to answer this question "yes," it will be more difficult for me to find a place to live.

35.    On July 22, 2008, I took a photograph of the premises.  A copy of the photograph is attached as Exhibit K.

FURTHER DECLARANT SAYETH NOT.

Torey T. Canfield

Executed on: ___07·28·08___
                    Date

Exhibit A

## INSTALLMENT REAL ESTATE SALE CONTRACT

THIS AGREEMENT, made this 31st day of October, 2007, by and between Mathew Setork and Mahmood Ghassemi, hereinafter referred to as "Seller," and Torey T. Canfield, hereinafter referred to as "Buyer."

1. Sale. Seller agrees to sell, and Buyer agrees to buy the following described real estate located in Kane County, Illinois, to-wit:

(legal description may be inserted by buyer or seller's attorney)

commonly known as 1161 Pearl, Aurora, Illinois, and hereinafter called the "premises."

2. Conveyance. Seller agrees that if Buyer shall first make the payments and perform the covenants, agreements and conditions on his part hereinafter set forth, that the Seller shall convey to the Buyer, in fee simple, clear of all encumbrances whatever, except as hereinafter provided, by a good and sufficient Warranty Deed, the said premises, subject to the conditions hereafter stated.

3. Title Conditions. The conveyance to be made by the Seller to the Buyer shall be expressly subject to the following:

(a)  All taxes, special assessments and special taxes levied after the year 2006 and installments of special assessments due and payable after closing date.

(b)  The rights of all persons claiming by, through or under the Buyer, and acts done or suffered by, and judgments against the Buyer.

(c)  The usual, customary and standard objections and general exceptions to title as are contained in the title insurance policies issued by a title insurance company.

(d)  All easements, covenants and restrictions of record.

(e)  Zoning and building ordinances and other governmental limitations that may affect the use of the premises.

4. Purchase Price. Buyer agrees to pay to Seller as the full purchase price for said premises, at such place as may be specified by Seller, the sum of approximately $249,900.00, such sum to be due and payable as follows:

(a)    The Buyer shall pay the sum of $1500.00 as down payment.

(b)    The remaining balance of the Purchase Price in the sum of $248,900.00, together with interest on the balance from time to time remaining, at the rates hereinafter mentioned, shall be payable as follows:

Commencing November 1, 2007, and continuing on the first day of each month thereafter, for a total of 24 months, monthly installments in the sum of approximately $1500.00. On or before December 1, 2009, the entire balance shall be paid in full.

(c)    Installment payments due on the first day of a month shall not be considered overdue or in default if paid by the 10th day of the month. Interest not paid by the 10th day of a month shall be added to principal, along with a late payment penalty equal to 5% each time the monthly installment payment be not paid by the 10th day of a month; and said sums shall bear interest at the same rate as such principal.

(d)    In addition to installments of principal and interest, Buyer shall, on each monthly payment date, deposit a sum in escrow for payment of real estate taxes and insurance, as part of the mortgage payment.

(e)    If Buyer closes by December 1, 2009, then Buyer shall receive $10,000.00 credit at closing. Failure to close by December 1, 2009 shall cause all money and security deposit/earnest money to be forfeited to Seller.

(f)    If Buyer fails to close by December 1, 2009, then Buyer shall pay the sum of $10,000.00 immediately.


5. Title Commitment: The Seller shall obtain, at Seller's expense, and deliver, or cause to be delivered to Buyer, at such time as Buyer has completed the payments hereunder, a title commitment for a title insurance policy issued by a title insurance company in the amount of the purchase price, covering title to the premises and showing title in the Seller subject only to the title exceptions set forth in Paragraph 3. The title commitment shall be conclusive evidence of good title as therein shown as to all matters insured by the policy, subject only to the exceptions as therein stated. If the title commitment discloses unpermitted exceptions, Seller shall have thirty (30) days fro the date of delivery thereof to have the exceptions removed from the commitment or to have the title insurer commit to insure against loss or damage that my be occasioned by such exceptions. At the request of Buyer made at closing, Seller shall forthwith obtain such title commitment, and deliver the same to Buyer within thirty (30) days after closing. Thereafter, Seller shall have no further expense with regard to such title commitment except for the charges incurred to clear any exceptions or obligations incurred by the act, omissions, or conditions suffered by the Seller. The title commitment provided herein shall be at Seller's expense, but any later date title commitment shall be at Buyer's expense.

6. <u>Liens</u>. The Buyer shall not and will not suffer nor permit any mechanic's liens or other lien to attach to, or be against or upon the premises sold hereunder, which shall or may be superior to the rights of the Seller.

7. <u>Alterations and Improvements</u>. Buyer agrees not to make, nor contract to make, any material alterations or improvements exceeding $3,000.00 in value, without first obtaining the written consent of the Seller, which written consent of Seller will not be unreasonably withheld. Buyer agrees to keep the premises and improvements in good repair and neat and orderly condition and to comply with all ordinances and lawful regulations or public authority, including Kane County building, zoning and health ordinances, to keep all weeds cut and brush and fallen limbs cleared.

8. <u>Assignment</u>. The Buyer shall not transfer nor assign this agreement, or any of its interest therein, and no transfer or assignment shall be made by the Buyer without the previous written consent of the Seller. Any such assignment or transfer, without such previous written consent, shall not vest in the transferee or assignee any right, title or interest therein or hereunder or in said premises, but shall render this agreement null and void, at the election of the Seller; and the Buyer will not sublet nor lease said premises, except to individual apartment tenants, for any purpose, except upon the previous written consent of the Seller, but the Seller's consent shall not be unreasonably withheld. No assignment shall relieve or release the Buyer from his personal obligation hereunder.

9. <u>Vesting of Title</u>. No right, title or interest, legal or equitable, in the premises aforesaid, or any part thereof, shall vest in the Buyer until the delivery of the Deed aforesaid by the Seller, or until the full payment of the purchase price at the times and in the manner herein provided.

10. <u>Modification</u>. No extensions, change, modification or amendment to or of this instrument of any kind whatsoever shall, or will be made or claimed by the Buyer, and no notice of any extension, change, modification or amendment made or claimed by the Buyer, shall have any force or effect whatsoever except the same shall be endorsed in writing on this Agreement and be signed by the parties hereto.

11. <u>Insurance</u>. The Seller shall keep all buildings at any time on said premises insured at its expense against loss by fire, and extended coverage risks in an amount at least equal of the sum remaining unpaid hereunder and not less than 80% of the insurable value thereof, which insurance, together with all additional insurance, shall require all payments for loss to be applied on said indebtedness covering the parties as their interests may appear, and Seller shall deliver the said policies of insurance to the Buyer. Buyer shall be added as an additional insured. Presently held insurance policies shall be assigned to Buyer, endorsed to show coverage of the parties as their interests may appear, and prepaid premiums shall be prorated at the time of closing. The Buyer shall also perform its obligations to insure, as herein provided, by making the monthly payments for insurance as required under Paragraph 17 below.

12. <u>Forfeiture</u>. In case of the failure of the Buyer to make any of the payments, or any part thereof, or perform any of the covenants hereof on Buyer's part hereby made and entered into, this agreement shall, at the option of the Seller, be forfeited and determined, and the Buyer shall forfeit all payments made by Buyer pursuant to this agreement, and such payments shall be retained by the Seller in full satisfaction of, and as liquidated damages by, Seller sustained; and in such event, the Seller shall have the right to re-enter and take possession of the premises aforesaid. Immediately, upon the service of any declaration or notice of forfeiture, and regardless of any period of time therein, herein or by law specified for the effect of such declaration or notice, all rentals due and accruing from the premises, and all parts thereof, shall be considered to be due to and collectible by the Seller, and are hereby irrevocably assigned by Buyer to Seller.

13. <u>Title to Improvements</u>. In the event of the termination of this agreement by lapse of time, forfeiture or otherwise, all improvements, whether finished or unfinished, on the premises aforesaid, which may be put upon or on said premises by the Buyer, shall belong to and be the property of the Seller without liability or obligation on Seller's part to account to the Buyer therefor, or for any part thereof.

14. <u>Legal Expenses</u>. The Seller shall and will pay to the Buyer all reasonable costs and expenses, including attorney's fees, incurred by the Buyer in any action or proceeding to which Buyer may be made a party by reason of being a party to this agreement, and the Seller shall pay to the Buyer all costs and expenses, including attorney's fees, incurred by the Buyer in enforcing any of the covenants and provisions of this agreement and incurred in any action brought by Buyer against the Seller on account of the provisions hereof, and all such costs, expenses and attorney's fees may be included in and form a part of any judgment entered in any proceeding brought by the Buyer against the Seller on or under this agreement.

The Buyer shall and will pay to the Seller all reasonable costs and expenses, including attorney's fees, incurred by the Seller in any action or proceeding to which Seller may be made a party by reason of being a party to this agreement, and the Buyer shall pay to the Seller all costs and expenses, including attorney's fees, incurred by the Seller in enforcing any of the covenants and provisions of this agreement and incurred in any action brought by Seller against the Buyer on account of the provisions hereof, and all such costs, expenses and attorney's fees may be included in and form a part of any judgment entered in any proceeding brought by the Seller against the Buyer on or under this agreement.

15. <u>Remedies</u>. The remedy of forfeiture herein given to the Seller shall not be exclusive of any other remedy, but the Seller shall, in case of default or breach, or for any other reason herein contained, have every other remedy given by this agreement and by law or equity, and shall have the right to maintain and prosecute any and every such remedy, contemporaneously and otherwise, with the exercise of the right of forfeiture, or any other right herein given.

16. <u>Non-Waiver</u>. No failure, or repeated failure, on the part of Seller to enforce or to require strict and literal compliance by Buyer of any one or more of the covenants or

agreements of the Buyer contained herein shall constitute or be deemed a waiver thereof, and no advance or prior notice shall be deemed a condition precedent to the Seller's insistence upon the requirement that Buyer keep, perform and comply with all and every covenant and agreement herein contained.

17.  <u>Possession, Taxes and Insurance</u>.  Possession of said premises shall be delivered to Buyer on or before October 1, 2007.  The Seller shall pay, prior to the past due date or dates, all of the general real estate taxes and other assessments levied or assessed against the said premises for the year 2006 and shall exhibit to Buyer receipts showing payments therefor.  The general real estate taxes and other assessments levied or assessed against the premises for the year 2007 shall be prorated to the date of possession.  The Seller shall pay from escrow, prior to the past due date or dates in each year, all of the real estate taxes and other assessments levied or assessed against the said premises, including Buyer's portion of the general real estate taxes for the year 2007.  Buyer shall deposit monthly with Seller a sum equal to one-twelfth (1/12) of the most recent tax bill on the premises, which sums shall be held in escrow by Seller, without interest, and used to pay tax bills when received.  If the escrowed sum is insufficient, Buyer will, on request, immediately pay the insufficiency.  Any amount advanced by Seller to pay taxes if not repaid within thirty (30) days, shall be added as additional principal due under this agreement as of the first day of the month in which Seller makes such advance, and shall bear interest at the rate herein specified.  Buyer shall also deposit monthly with Seller a sum equal to one-twelfth (1/12) of the most recent annual insurance premium, which sum shall be held in escrow by Seller in the same manner, and any amount advanced by Seller to pay the insurance premiums shall likewise be added as additional principal hereunder.

18.  <u>Code Violations</u>.  Seller warrants to Buyer that no notice from any city, village or other governmental authority or any dwelling code violations have heretofore been issued and received by the owner or his agent with respect to any dwelling structure on said real estate.

19.  <u>Notices</u>.  All notices and demands necessary or desirable to be given hereunder shall be in writing and delivered in person or sent by certified or registered mail, if for Seller, addressed to 111 S. Lake St., Montgomery, Illinois, or to such place as the Seller may from time to time advise; and if for Buyer, addressed to 1161 Pearl, Aurora, Illinois, or to such other address as is stated in a notice given in compliance herewith.

20.  <u>Time of Essence</u>.  It is agreed between the Seller and the Buyer that time shall be of the essence of this agreement.

21.  <u>Successors</u>.  The covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators, successors and assigns of the respective parties.

22.  <u>Recording Agreement</u>.  This Agreement or any Memorandum thereof may be recorded in the Recorder's Office of the county wherein the property is located.

23. <u>Termite Inspection and Survey</u>. Any termite inspection or survey shall be incurred at Seller's expense at time of final closing.

24. <u>Condemnation and/or Easement</u>. If the subject property is ever condemned by any governmental entity and/or an easement is granted on said property any money received from said condemnation and/or easement shall be immediately turned over to the Seller and applied towards the principal. If said money does not pay off the contract balance in full then said monthly payment of principal and interest on the contract shall be adjusted accordingly.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the day and year first above written.


BUYERS:                              SELLERS:

# Exhibit B

# RENT TO OWN
# PAYMENTS FOR 24 MONTHS!
## For 1161 Pearl St. Aurora IL, 60505

| Payment | Credit | Description | Renter | Owner | Date |
|---------|--------|-------------|--------|-------|------|
| $ 1500 | — | House Payment | FC | WR | 1/1/08 |
| $ 1500 | — | House Payment | FC | WR | 2/1/08 |
| $ 1500 | — | House Payment | FC | WR | 3/1/08 |
| $ 1500 | — | House Payment | FC | WR | 4/1/08 |

# Exhibit C

## THE LAW OFFICE OF J. BRYAN WOOD

53 WEST JACKSON BOULEVARD, SUITE 660 CHICAGO, ILLINOIS 60604
PHONE: 312-545-1420  FACSIMILE: 312-577-0749  E-MAIL: BRYAN@JBRYANWOODLAW.COM

June 10, 2008

**VIA FACSIMILE & CERTIFIED MAIL**
Mr. Matthew Setork
Cross Lander of Montgomery, Inc.
Kawasaki of Montgomery, Inc.
1860 Winchester Court
Oswego, IL 60543

**Re:    Torey Canfield's Separation of Employment**

Dear Mr. Setork:

I represent Torey Canfield in connection with claims arising from his agreements, employment and separation of employment with your companies. Mr. Canfield has asked that I contact you prior to pursuing legal claims on his behalf to explore potential for early resolution.

Based on the circumstances Mr. Canfield described to me, it appears many of his employment and contractual civil rights were violated.  For example, it appears the following statutes likely have been violated:

➢ The Illinois Wage Payment and Collection Act, the Fair Labor Standards Act and Illinois common law (by deducting payments from Mr. Canfield's wages without prior, written authorization);
➢ The Illinois Wage Payment and Collection Act, the Fair Labor Standards Act and the Illinois common law (by refusing to pay Mr. Canfield commissions and wages owed to him upon his termination of employment);
➢ Title VII, the Illinois Human Rights Act and 42 U.S.C. § 1981 (by creating and/or allowing a hostile work environment for Mr. Canfield during his employment);
➢ Title VII, the Illinois Human Rights Act and 42 U.S.C. § 1981 (by terminating Mr. Canfield's employment based on his race and race-based stereotypes); and
➢ Anti-retaliation provisions of each of the forgoing laws (by terminating Mr. Canfield's employment because he opposed practices made unlawful by the above statutes or otherwise retaliating against him).

Additionally, from speaking with Mr. Canfield, it appears your companies may engage in deceptive, discriminatory and/or unlawful lending practices by –

## THE LAW OFFICE OF J. BRYAN WOOD

Mr. Matthew Setork
June 10, 2008
Page 2 of 3

among other things – offering different financing terms based on race. As I am sure you are aware, such practices violate a host of laws. As a recipient of financing from your companies (through the purchase of his motorcycle and/or his rent-to-own home), Mr. Canfield has standing to bring claims regarding these practices on behalf of himself and others like him who may have been offered different financing terms based on their race.

As you may know, Mr. Canfield could elect to pursue many of his claims in Court at any moment. Only Mr. Canfield's Title VII and Illinois Human Rights Act claims must be filed with a government agency before they can be pursued in Court. Moreover, there are no limits on damages on many of the claims on which Mr. Canfield can proceed to Court immediately (*e.g.*, his Section 1981 race discrimination claims – for employment or discriminatory lending practices – or his Illinois Wage Payment and Collection Act claims).

Indeed, for Mr. Canfield's claims under the Illinois Wage Payment and Collection Act, you may be held individually liable (in addition to the companies you own) and the remedies on some of those claims can include criminal penalties. *See, e.g.*, 820 ILCS 115/13 (establishing individual liability) and 820 ILCS 115/14 (making certain violations, including retaliation, a "Class C misdemeanor").

Based on the information I have reviewed, it appears to me that a trial of at least some of Mr. Canfield's claims is very likely. Much of the evidence in support of Mr. Canfield's claims will be "he said/she said" type of evidence and/or incontrovertible data (e.g., finance terms offered to your companies' customers). For example, Mr. Canfield contends you mentioned his race shortly before calling the police and falsely accusing him of theft on approximately May 24, 2008 (the day Mr. Canfield was terminated). You and your companies presumably will dispute many of the important facts regarding Mr. Canfield's legal claims. Thus, a jury trial likely will be necessary to resolve those disputes.

As you might imagine, defending against Mr. Canfield's claims should he pursue them in Court will be time-consuming and very expensive. Based on my experience representing employers in similar types of matters, I would estimate that your attorneys may well exceed $50,000 even before a trial in this matter.

## THE LAW OFFICE OF J. BRYAN WOOD

Mr. Matthew Setork
June 10, 2008
Page 3 of 3

Moreover, based on my discussions with Mr. Canfield, I believe he will prevail on at least some of his legal claims.  Depending on the types of legal claims on which Mr. Canfield prevails, you may be obligated to pay Mr. Canfield's attorney's fees and costs as well.  Assuming the matter goes to trial, I anticipate those fees will exceed $75,000 and possibly even $100,000.

But, as mentioned at the outset, Mr. Canfield would prefer exploring potential resolution before filing claims in Court.  Additionally, since Mr. Canfield has been barred from your premises at 111 S. Lake Street, he has asked that we discuss how he can provide a money order to satisfy payments due under his contracts.  Mr. Canfield would like to make those payments, in part, as a gesture of good faith.

As a reciprocal showing of good faith, Mr. Canfield asks that you immediately and unconditionally pay him the commissions and wages he earned but has not been paid (which he estimates at $2,000 in salary and approximately $1,500 in unpaid commissions).  This will not resolve all of Mr. Canfield's claims, but will be seen as a token of good faith in the parties' efforts to resolve those claims.

Assuming you are interested, please let me know when you might be available to discuss these issues.  The best way to reach me is by phone, facsimile or e-mail using the contact information below.   If I do not hear from you or your legal representative by Tuesday, June 16, 2008, I will assume you are not interested in exploring resolution and will proceed accordingly.  I hope to hear from you soon.

Best regards,

J. Bryan Wood

cc:     Matthew Setork, 2443 Millington Court, Aurora, IL 60504
        Matthew Setork, 111 S. Lake Street, Montgomery, IL 60538

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature]
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
6-12-08

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

Mr. Matthew Setork
Cross Lander of Montgomery, Inc.
Kawasaki of Montgomery, Inc.
111 S. Lake Street
Montgomery, IL 60538

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☒ Yes

2. Article Number
(Transfer from service label)
7004 2510 0001 9464 1646

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature]   ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
6/17

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

Mr. Matthew Setork
Cross Lander of Montgomery, Inc.
Kawasaki of Montgomery, Inc.
1860 Winchester Crt
Oswego, IL 60543

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
7004 2510 0001 9464 1707

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

Exhibit D

## THE LAW OFFICE OF J. BRYAN WOOD

53 WEST JACKSON BOULEVARD, SUITE 660 CHICAGO, ILLINOIS 60604
PHONE: 312-545-1420  FACSIMILE: 312-577-0749  E-MAIL: BRYAN@JBRYANWOODLAW.COM

June 24, 2008

**VIA FACSIMILE**
Mr. James Jensen
Attorney at Law
149 South Lincolnway, Ste. 200
North Aurora, IL 60542

**Re:    Torey Canfield/Cross Lander of Montgomery**

Dear Mr. Jensen:

As we discussed last week, Mr. Canfield disputes your client's calculation of the wages and commissions owed to him for his employment during the month of May 2008, as well as your client's contention Mr. Canfield was paid $2,600 as indicated in your letter.

Based on reviewing the limited information available to him and his recollection, Mr. Canfield estimates that he is owed the following:

| Type of Commission | Quantity/Terms | Amount |
|---|---|---|
| Kawasaki financing | 17 @ $150 per deal | $2,550 |
| Kawasaki back-end – Tire & Wheel | 7 @ $50 per deal | $350 |
| Kawasaki back-end – GTTP | 3 @ $50 per deal | $150 |
| Auto financing | 19 @ $150 per deal | $2,850 |
| Auto financing – units Canfield sold | 3 @ $175 per deal | $525 |
| Auto back-end – Warranty | 10 @ $75 per deal | $750 |
| Auto back-end – Gap-Ins | 2 @ $75 per deal | $150 |
| | SUBTOTAL: | $7,325 |
| | Minus wages paid: | ($2,000) |
| | TOTAL | $5,325 |

If your client disputes this amount, please let me know. Otherwise, we would appreciate it if your client would pay Mr. Canfield the wages and commissions he is owed as a good faith gesture and first step in the parties' efforts to explore potential resolution – including resolution of Mr. Canfield's civil rights claims. As part of this dialogue, Mr. Canfield has asked that we discuss how he can provide a money order to satisfy payments due under his contracts.

## THE LAW OFFICE OF J. BRYAN WOOD

Mr. James Jensen
June 24, 2008
Page 2 of 2


      Please let me know when you are available by phone to discuss how this dialogue can move forward.  I am speaking at convention in Atlanta for Plaintiffs' employment civil rights lawyers this week and, thus, will have limited availability.  But I will have access to phone, e-mail and fax so we can set up a time to talk more extensively before July 4, 2008.  Please contact me before then to let me know your availability and your client's interest in such a dialogue.

Best regards,



J. Bryan Wood

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **To:** | bryan@jbryanwoodlaw.com; |
| **Subject:** | Successful transmission to 16308925277. Re: Torey Canfield |
| **Date:** | Tuesday, June 24, 2008 4:10:31 PM |

Dear J. Bryan Wood,

Re: Torey Canfield

The 3 page fax you sent through eFax.com to 16308925277 was  successfully transmitted at 2008-06-24 21:10:29 (GMT).

The length of transmission was 84 seconds.

The receiving machine's fax ID: 16308925277.


If you need additional assistance, please visit our online help center at http://www.efax.com/help/. Thank you for using the eFax service.

Best Regards,
eFax.com

Customer Service
Help: http://www.efax.com/help/
Tel: 323-817-3205 (US) or 0870 711 2211 (UK)
Email: help@mail.efax.com

Exhibit E

UNITED STATES POSTAGE
PITNEY BOWES
$000.42⁰
02 1P    0004318268  JUN 23 2008
MAILED FROM ZIP CODE 60538

City of Aurora
44 E. Downer Place
Aurora IL 60507-2067



Cross Lander of Montgomery, Inc.

111 South Lake Street, Montgomery, IL 60538

CROSS LANDER OF MONTGOMERY, INC
KAWASAKI OF MONTGOMERY, INC
111 S. Lake St.
Montgomery, IL 60538
(630)966-9600

To Whom It May Concern:

I have been receiving the bills from City of Aurora regarding the property of 1161 Pearl St in Aurora. The current resident for that property has been Torey Canfield since the 31st day of October 2007. He still remains to be the owner and resident. I would greatly appreciate it if the bills are sent to him from hereon. If you have any questions or concerns, please do not hesitate to contact me at the above mentioned number.

Sincerely,

Mathew Setork

*water Dept. Worker*
*(Isabel Kodron).*
*Spoke with Mr. Setork June 25th 2008*

Exhibit F

**NOTICE OF INTENTION TO DECLARE FORFEITURE OF**
**ALL RIGHTS UNDER INSTALLMENT REAL ESTATE CONTRACT**
**AND NOTICE OF INTENTION TO FILE FORCIBLE DETAINER SUIT**

To:    Torey T. Canfield
       1161 Pearl
       Aurora, IL 60505

YOU ARE HEREBY NOTIFIED THAT:

WHEREAS, Mathew Setork and Mahmood Ghassemi, hereinafter referred to as "Seller", entered into on the 31st day of October, 2007 a certain Installment Real Estate Contract, with Torey T. Canfield, hereinafter referred to as "Purchaser", concerning the following legally described real estate:

See attached legal description.

commonly known as 1161 Pearl, Aurora, Illinois, hereinafter referred to as "Property"; and

WHEREAS, Purchaser in the Installment Real Estate Contract agreed to pay the sum of Two Hundred Forty Nine Thousand Dollars ($249,000.00) for the property, with One Thousand Five Hundred Dollars ($1500.00) paid upon execution of the Contract and to pay monthly installments of One Thousand Five Hundred ($1500.00) Dollars through November of 2009, and, on or before December 1, 2009, to pay the remaining balance in full; and

WHEREAS, the Installment Real Estate Contract provide in part that time is of the essence, and that in the event of the Purchaser's default in any payment of principal and/or interest when due, or if Purchaser should fail to perform any of the other covenants of the Installment Real Estate Contract, then the Installment Real Estate Contract shall, at the option of the Seller, be forfeited and determined, and any and all payments theretofore made by Purchaser shall be retained by Seller; and

WHEREAS, Purchaser has failed to pay any of the installment payments under the Contract, and that there is now due and owing Seller the sum of Twelve Thousand Six Hundred Dollars $12,600.00, representing the aforesaid unpaid installments plus late fees provided in the Contract of $75.00 per month for payments not made by the 15th of the month; and

WHEREAS, the Installment Real Estate Contract provide that the Purchaser shall pay all reasonable costs and expenses, including attorney fees, incurred by Seller in enforcing the Contract.

NOW, THEREFORE, YOU ARE HEREBY NOTIFIED:

1.    Unless all defaults under the Installment Real Estate Contract are cured, on or before the 31st day of July, 2008, by payment of the entire balance owed under said Contract plus Seller's attorney fees that it is the intention of the Seller to declare all your rights under the Contract to be forfeited, and all payments made by you will be retained by Seller.

2.    That it is the intention of the Seller to seek possession of the property by commencing proceedings under an act relating to forcible entry and detainer unless you remedy the aforesaid defaults on or before the 31st day of July, 2008.

IN WITNESS WHEREOF, Jay R. Wyeth, as attorney and agent for Seller, has hereunto set his hand and seal this 23rd day of June, 2008.

Jay R Wyeth

Subscribed and sworn to before me
this ___ day of June, 2008.

Notary Public

"OFFICIAL SEAL"
Jackie Turnbow
Notary Public, State of Illinois
My Commission Exp. 07/12/2010

JAY R. WYETH
Attorney at Law
149 South Lincolnway
Suite 200
North Aurora, Illinois 60542
(630) 892-5252

## AFFIDAVIT OF SERVICE

BRIAN HUNGER, being duly sworn on oath, deposes and says that on the ____ day of ____, 2008, he served a copy of the Notice of Intention to Declare Forfeiture of All Rights Under Installment Real Estate Contract and Notice of Intention to File Forcible Detainer Suit by personally delivering a copy thereof to:

_____
BRIAN HUNGER

SUBSCRIBED and SWORN to before me this ____ day of _____, 2008.

_____
Notary Public

# Exhibit G

## THE LAW OFFICE OF J. BRYAN WOOD

53 WEST JACKSON BOULEVARD, SUITE 660 CHICAGO, ILLINOIS 60604
PHONE: 312-545-1420  FACSIMILE: 312-577-0749  E-MAIL: BRYAN@JBRYANWOODLAW.COM

July 2, 2008

**VIA FACSIMILE & U.S. MAIL**
Mr. James Jensen
Attorney at Law
149 South Lincolnway, Ste. 200
North Aurora, IL 60542

**Re:     Torey Canfield & Cross Lander of Montgomery, Inc., Kawasaki of
          Montgomery, Inc., Matthew Setork, Mahmood Ghassemi, and
          J. R. Wyeth, Attorney at Law**

Dear Mr. Jensen:

I write in response to your client's delivery of the "Notice of Intention to Declare Forfeiture Of All Rights Under Installment Real Estate Contract And Notice Of Intention To File Forcible Detainer Suit" on Mr. Canfield (attached and referred to as "The Notice").

When you and I discussed the fact that your client was planning to serve such a notice earlier this week, I explained that there may be an accounting or clerical error in recording payments. Additionally, I asked you to provide information regarding payments your client thought were not made in an attempt to resolve the issue. Since then, I have not heard from you.

The Notice explains that "Purchaser [Mr. Canfield] has failed to pay any of the installment payments under the Contract." That clearly is not accurate, as evidenced by Mr. Setork's initials confirming receipt of payment on the attached page. It is possible Mr. Wyeth was acting based on inaccurate information provided by Mr. Setork and without knowledge of other aspects of the parties' disputes. But based on my conversation with you, that is not the only possible inference that can be drawn.

Rather, Mr. Canfield believes Mr. Setork is using this Notice as a means of retaliating against him for attempting to enforce his federally protected civil rights or engaging in other lawfully protected activity. Specifically, Mr. Canfield believes Mr. Setork is trying to place him under personal and financial strain by, among other things, working to have him evicted. Retaliation may also be the reason Mr. Setork recently attempted to have the water bill for the property at issue in the Notice transferred to Mr. Setork's name (an act seemingly

## The Law Office Of J. Bryan Wood

Mr. James Jensen
July 3, 2008
Page 2 of 3

inconsistent with his desire to retake possession of the property, but consistent with placing Mr. Canfield under greater personal and financial strain).

As you may know, the Supreme Court recently held retaliation was a form of discrimination prohibited by 42 U.S.C. § 1981 ("Section 1981"). *See Humphries v. CBOCS, Inc.*, 128 S.Ct. 1951 (2008). As you may also know, 42 U.S.C. § 1985 ("Section 1985") creates liability:

"*if two or more persons conspire* for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny any citizen the equal protection of the laws, or *to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws*." *See* 42 U.S.C. § 1985(2) (emphasis added).

Specifically, Section 1985 states "the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against *any one or more of the conspirators*." 42 U.S.C. § 1985(3) (emphasis added).

Moreover, as you may know, Section 42 U.S.C. § 1986 ("Section 1986") creates liability for an individual "having power to prevent or aid in preventing" violations of Section 1985 that "neglects or refuses so to do." Specifically, if a violation of Section 1985 occurs, individuals who failed to act "shall be liable to the party injured … for all damages caused by the wrongful act, which such person by reasonable diligence could have prevented." 42 U.S.C. § 1986.

In light of the foregoing, I need to communicate with other individuals or entities about this matter. To avoid any potentially improper communications, please confirm you represent Mr. Setork individually with respect to this matter. Additionally, please also let me know whether you represent each of the following individuals or entities with respect to this matter:

Cross Lander of Montgomery, Inc.
Kawasaki of Montgomery, Inc.
Mathew Setork
Mahmood Ghassemi

Phone: 312-545-1420  Facsimile: 312-577-0749 Email: bryan@jbryanwoodlaw.com
53 West Jackson Boulevard, Suite 660 Chicago, Illinois 60604
www.employeescivilrights.com

## THE LAW OFFICE OF J. BRYAN WOOD

Mr. James Jensen
July 3, 2008
Page 3 of 3

Jay R. Wyeth, Attorney at Law

Lastly, I again (and perhaps for the final time) relay Mr. Canfield's offer to discuss proposed resolution before taking legal action.  Given recent developments, Mr. Canfield may be required to seek preliminary injunctive relief in Federal Court (e.g., to stop retaliation and preserve his rights under the Installment Contract) prior to pursing any of his statutory discrimination claims through any administrative agency.  But prior to doing that, Mr. Canfield hopes the parties or their representatives can meet to discuss global resolution of their expanding dispute.

I am available to meet with you on the afternoon of Tuesday, July 8 or Wednesday, July 9.  If you think it would be helpful for our clients to attend this meeting, please let me know.

If I do not hear from you by 12:00 noon on Tuesday, July 8, I will assume your client has no interest in discussing resolution and will proceed accordingly.

Best regards,

J. Bryan Wood

Encls.

**From:**          send@mail.efax.com
**To:**            bryan@jbryanwoodlaw.com;
**Subject:**       Successful transmission to 16308925277. Re: Torey Canfield
**Date:**          Thursday, July 03, 2008 4:59:57 PM

Dear J. Bryan Wood,

Re: Torey Canfield

The 8 page fax you sent through eFax.com to 16308925277 was  successfully transmitted at 2008-07-03 21:59:56 (GMT).

The length of transmission was 266 seconds.

The receiving machine's fax ID: 16308925277.


If you need additional assistance, please visit our online help center at http://www.efax.com/help/. Thank you for using the eFax service.

Best Regards,
eFax.com

Customer Service
Help: http://www.efax.com/help/
Tel: 323-817-3205 (US) or 0870 711 2211 (UK)
Email: help@mail.efax.com

# Exhibit H

Online Personal Credit Reports & Credit Scores - TrueCredit

**INQUIRIES (2 years):**     11                    31                    45



| | X | OK | | 90 | 120 | 150 | PP | RF | CO |
|---|---|---|---|---|---|---|---|---|---|
| Not Applicable | Unknown | Current | 30 days late | 60 days late | 90 days late | 120 days late | 150+ days late | Payment plan | Repossession foreclosure | Collection Chargeoff |

**Real Estate Accounts:** Primary and secondary mortgages on your home

**CROSSLANDER**

| | TransUnion | Experian | Equifax |
|---|---|---|---|
| **Account No.:** | 3147*** | | |
| **Condition:** | Open | | |
| **Balance:** | $239900 | | |
| **Type:** | Note loan | | |
| **Pay Status:** | Current | | |
| **Past Due:** | $0 | | |
| **High Balance:** | $259900 | | |
| **Terms:** | 30 months | | |
| **Limit:** | | | |
| **Payment:** | $2000 | | |
| **Opened:** | 01/01/2007 | | |
| **Reported:** | 05/05/2008 | | |
| **Responsibility:** | Individual | | |

**Late Payments (last 7 years):**
| | |
|---|---|
| 30 Days Late: | 0 |
| 60 Days Late: | 0 |
| 90 Days Late: | 0 |

**Two Year Payment History:**

TransUnion OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK

Experian

Equifax

May Jun Jul Aug Sep Oct Nov Dec '07 Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec '08 Feb Mar Apr

**Remarks:**

[TransUnion]

[Experian]

[Equifax]

**Revolving Accounts:** Accounts with an open-end term

**HSBC BANK**

| | TransUnion | Experian | Equifax |
|---|---|---|---|
| **Account No.:** | 51202560**** | | |
| **Condition:** | Open | | |
| **Balance:** | $235 | | |
| **Type:** | Credit Card | | |
| **Pay Status:** | Current | | |
| **Past Due:** | $0 | | |
| **High Balance:** | $285 | | |
| **Terms:** | | | |
| **Limit:** | $300 | | |

| INQUIRIES (2 years): | 25 | 31 | 45 |
|---|---|---|---|



|  | X | CK |  | 90 | 120 | 150 | PP | RF | CO |
|---|---|---|---|---|---|---|---|---|---|
| Not Applicable | Unknown | Current | 30 days late | 60 days late | 90 days late | 120 days late | 150+ days late | Payment plan | Repossession Foreclosure | Collection Chargeoff |

**Real Estate Accounts:** Primary and secondary mortgages on your home

**CROSSLANDER**

|  | **TransUnion** | **Experian** | **Equifax** |
|---|---|---|---|
| Account No.: | 3147*** | | |
| Condition: | Open | | |
| Balance: | $248900 | | |
| Type: | Note loan | | |
| Pay Status: | Late 120 Days | | |
| Past Due: | $9170 | | |
| High Balance: | $249900 | | |
| Terms: | 30 months | | |
| Limit: | | | |
| Payment: | $2000 | | |
| Opened: | 01/01/2007 | | |
| Reported: | 07/01/2008 | | |
| Responsibility: | Individual | | |

**Late Payments (last 7 years):**

| 30 Days Late: | 0 |
|---|---|
| 60 Days Late: | 0 |
| 90 Days Late: | 0 |

**Two Year Payment History:**

TransUnion CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK CK

Experian

Equifax

Jul Aug Sep Oct Nov Dec '07 Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec '08 Feb Mar Apr May Jun

**Remarks:**

[TransUnion]

[Experian]

[Equifax]

**Revolving Accounts:** Accounts with an open-end term

**HSBC BANK**

|  | **TransUnion** | **Experian** | **Equifax** |
|---|---|---|---|
| Account No.: | 51202560**** | | |
| Condition: | Open | | |
| Balance: | $288 | | |
| Type: | Credit Card | | |
| Pay Status: | Current | | |
| Past Due: | $0 | | |
| High Balance: | $298 | | |
| Terms: | | | |
| Limit: | $300 | | |

# Exhibit J

BP
767KFM

# A CITY SECOND TO NONE – AURORA, ILLINOIS
## REQUEST FOR INFORMATION OR RECORDS
## PURSUANT TO THE STATE OF ILLINOIS'
## FREEDOM OF INFORMATION ACT

FOIA # _08-0304_

DATE OF REQUEST _7/3/08_

(After 3:00 p.m. use tomorrow's date)
Mail To: 264-INFO/Customer Service Center
3770 McCoy Drive, Aurora, IL 60504
or Fax (630) 898-6538
Questions Please Call (630) 264-INFO/(630) 264-4636

RECEIVED
JUN 03 2008
FOIA Data Entered by: ST
FAX VIA MAIL

NAME: _Torey T Canfield_

ADDRESS: _1161 Pearl St._

CITY: _Aurora_  STATE: _IL_  ZIP: _60505_

TELEPHONE: Home: _630-859-8589_  Office: _____

EMAIL ADDRESS: _tCanfield @ Hotmail.com_ FAX: _630-859-8589 - call first fax is on phone line_

Please indicate if you wish to review material or require copies.  ☑ Copy  ☐ Inspect  ☑ Both

_Monday_  _7/7/08_

In order to expedite the search for records, please use the attached sheet to specify what records you are requesting. The City of Aurora will respond to this request within seven (7) working days. (If request requires an extension, seven additional working days will be requested, and will be sent to you in writing.

Signature of person making request: _____

| OFFICE USE ONLY | |
|---|---|
| ☒ APPROVED | Signature of Individual Processing FOIA Form<br>_Jeshino Nair_<br>**Please Print Name and Title** |
| ☐ DENIED | **Department Name and Phone Number** |

_See attached notes_

Please Note: The Illinois Freedom of Information Act allows the City of Aurora to charge for the costs of reproductions. If said costs exceed $10.00, payment in full of the amount owed will be required BEFORE materials are released.

Description of Documents:

I would like to Know if the Property ~~was~~ PAssed All Inspections which would make it suitible to Live in or even rentable, - 1161 Pearl St.

## Issue Number - COAC-7G7KFM

| | | | |
|---|---|---|---|
| Created Date: | 07/03/2008 09:52:11 AM | | |
| Created By: | Julie Twirago/Aurora | | |
| Assignee: | Janine Mair/Aurora | | |
| Status: | Closed | Contact Inquiries: | 0 |
| Due Date: | 07/03/2008 11:52:00 AM | Source: | FAX |
| First Response: | 07/03/2008 02:02:00 PM | Priority: | High |

### Description
What type of information are you requesting?... SEE ATTACHMENT AND DOWNLOAD

### Contact Name
TOREY CANFIELD

### Communication
Email:        tcanfield@hotmail.com

### Contact Address
1161 PEARL ST
AURORA IL, USA

Home Phone: 6308598589
Home Fax:    6308598589

### Comments
PLEASE CALL BEFORE SENDING FAX, SINCE FAX AND PHONE ARE SAME LINE.

### Location Address
1161 PEARL ST
AURORA IL, USA

### Location Attributes
Ward:

### Details
Department / Unit :       Community Development / Building and Permits
Issue Type / Subtype:   FOIA / Building and Permits

## Issue Number - COAC-7G7LY5

Created Date:      07/03/2008 11:09:47 AM
Created By:        Julie Twirago/Aurora
Assignee:          Shelly Windett/Aurora
Status:            Pending                            Contact Inquiries:    0
Due Date:          07/09/2008 01:09:00 PM             Source:               FAX
First Response:    07/07/2008 07:47:02 AM             Priority:             High

### Description
What type of information are you requesting?... SEE ATTACHMENT AND DOWNLOAD

**Contact Name**                    **Communication**
TOREY CANFIELD                      Email:        tcanfield@hotmail.com

**Contact Address**                 Home Phone: 6308598589
1161 PEARL ST                       Home Fax:    6308598589
AURORA IL, USA

**Comments**
PLEASE CALL BEFORE SENDING FAX, SINCE FAX AND PHONE ARE SAME LINE.

**Location Address**
1161 PEARL ST
AURORA IL, USA

**Location Attributes**
Ward:

**Details**
Department / Unit :     Neighborhood Standards / Property Standards
Issue Type / Subtype:   FOIA / Property Standards

**Warren, Nancy**

| | |
|---|---|
| **From:** | Janine_Mair/Aurora@COA.AURORA-IL.ORG on behalf of Issue_Manager@COA.AURORA-IL.ORG |
| **Sent:** | Thursday, July 03, 2008 2:03 PM |
| **To:** | Warren, Nancy |
| **Subject:** | Notice: COAC-7G7KFM - Status Change (Closed) |

This Issue is CONFIDENTIAL.

7/3/2008 02:03 PM - Janine Mair/Aurora
Status Change
    Previous: Open
    New: Closed7/3/2008 02:02 PM - Janine Mair/Aurora Action Taken: All building
inspections are approved.  No Final Engineering approval.  Certificate of Occupancy has
not been issued.  Cannot Occupy until C.O. has been issued.


If using a browser, you may view the original issue by clicking on the following URL -
http://coacs.coa.aurora-il.org/PRO/Service.NSF/pa_Service?OpenPage&COAC-7G7KFM

Issue Number: COAC-7G7KFM

Contact Information
    Name: TOREY CANFIELD
    Address: 1161 PEARL ST , AURORA IL USA
    Home Phone: 6308598589
    Work Phone:

Location Information
    Address: 1161 PEARL ST , AURORA IL USA

Issue Information
    Priority: High
    Status: Closed
    Assignee: Janine Mair
    Issue Type/Subtype: FOIA/Building and Permits
    Department/Unit: Community Development/Building and Permits
    DueDate: 7/3/2008 11:52:00 AM

Description:
What type of information are you requesting?...  SEE ATTACHMENT AND DOWNLOAD

Action History:
-------------------------------------------------------
7/3/2008 02:03 PM - Janine Mair/Aurora
Status Change
    Previous: Open
    New: Closed
Logged:7/3/2008 2:03:09 PM
-------------------------------------------------------
7/3/2008 02:02 PM - Janine Mair/Aurora
Action Taken: All building inspections are approved.  No Final Engineering approval.
Certificate of Occupancy has not been issued.  Cannot Occupy until C.O. has been issued.
Logged:7/3/2008 2:02:56 PM

1

Exhibit K

